**Miguel Angel GARCIA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 08–97–00239–CR.

Court of Appeals of Texas, El Paso.

Feb. 29, 2000.

Francisco F. Macias, El Paso, for Appellant.

Jaime E. Esparza, Dist. Atty., John L. Davis, Asst. Dist. Atty., El Paso, for State.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Miguel Angel Garcia appeals his conviction for capital murder of a child under six

years of age. Upon the jury's finding of guilt, the trial court assessed mandatory punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. We affirm.

## LEGAL SUFFICIENCY

Appellant was convicted of the capital murder of his three-month-old daughter, Cassandra. By four points of error, he challenges his conviction. We address his fourth point first since it challenges the legal sufficiency of the evidence to support his conviction.

### Standard of Review

In reviewing the sufficiency of the evidence to support a criminal conviction, we must review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jones v. State*, 833 S.W.2d 118, 122 (Tex. Crim.App.1992). Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Stoker v. State*, 788 S.W.2d 1, 6 (Tex.Crim.App. 1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). Nor do we resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991). Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843.

### Evidence at Trial

The evidence reveals that on May 20, 1996, Maria Garcia, Cassandra's mother, was taking a shower when she heard the baby crying. When she got out of the bath to check on the baby, she found Cassandra with Appellant. At the time, Appellant told her that he did not know what happened—that the baby just started crying all of a sudden. In the early morning hours of May 21, 1996, Maria was awakened by the baby's crying. Cassandra appeared very pale and limp. Appellant shook the baby in an attempt to revive her. The parents then took Cassandra to R.E. Thomason Hospital in El Paso. At the hospital, Appellant told Maria that Cassandra had fallen out of his arms and hit her head on the bassinet. He also told her that he had a criminal record and the baby would be taken away from them unless Maria said that she had dropped Cassandra. Maria agreed and took responsibility for dropping the baby.

Appellant subsequently told Maria that Cassandra had really fallen to the floor and not just to the bassinet. This is consistent with the testimony of Dr. Carl Geler, Chief of Neurosurgery at Thomason, who testified that Cassandra had a skull fracture and was bleeding inside her brain. Merely bumping Cassandra against the side of the bassinet would not have caused the skull fracture.

On July 21, 1996, Maria went to work at approximately 9:45 a.m., leaving Cassandra with Appellant. Maria testified that Cassandra was fine when she left. Later that afternoon, Cassandra was rushed by ambulance to Providence Hospital in El Paso. She was not breathing and had no pulse. Efforts to resuscitate her were fruitless and she was pronounced dead by Dr. Jacob Patrick Vigil. At the time, Dr. Vigil noted that Cassandra had blood on her forehead and her nose was bruised.

After Cassandra died, detectives from the Crimes Against Persons division took a statement from Appellant. Beginning his statement in Spanish, Appellant acknowl-

edged that he was taking care of Cassandra while Maria was at work. While he was bathing the baby, she slipped out of his hands and bumped the back of her head. Cassandra slept a little after that, then awoke crying. Appellant fixed her a bottle, but she did not want to eat. All of a sudden, Cassandra went limp. He tried to give her mouth to mouth resuscitation and he squeezed her.

Appellant admitted that several times he had grabbed or held Cassandra because she would not stop crying and that he had squeezed her violently. At this point, Appellant began speaking in English. He stated that he was the one that caused several of the injuries to Cassandra. Every time he was with her, she would begin to cry and he would "lose it." He grabbed her by her chest and shook her in order to get her to stop crying. He would also grab her by her collarbone and shake and squeeze her hard in order to keep her from crying. He caused most of her injuries by shaking her "real hard and squeezing her. I hardly ever hit her with my fist. I do have a very violent temper and sometimes I do lose it with my daughter Cassandra...."

Appellant also admitted to being the one who dropped Cassandra in May 1996, and the one who caused her injuries on July 21, 1996, the date of her death.

I wish to say that it was I who dropped Cassandra on the 19th day of May 1996 and not my wife. We took Cassandra to the hospital on the next day. I had her by her feet and her head hit the floor. She had been crying a lot that day that I dropped her. I picked her up and lost control of her because she was struggling and I dropped her.... [T]oday, around 1:00 p.m., Cassandra began to cry a lot and I got angry with her. I yelled at her to stop and I shook her by holding her chest and then her arms. I did hit her with the palm of my hand in the area of her stomach and chest and that was because I was frustrated and then again when she lost consciousness

and I became scared. Again, I want to say that it is I who had hurt my daughter Cassandra and not my wife. I am willing to pay for what I have done to my daughter, but again, it was because I am really frustrated with my life and the way my life is going. I did hit my daughter today with my right fist on the chest and stomach and with a karate type chop to the nose area.

Dr. Juan Contin, El Paso County Chief Medical Examiner, testified that the injuries sustained by Cassandra were consistent with shaking. He also confirmed that she had a subarachnoid hemorrhage on the surface of her brain and healing rib and clavicle fractures. Dr. Harry Wilson, an expert in pediatric pathology as it relates to child abuse and child abuse deaths, testified that Cassandra died as a result of Shaken Infant Syndrome. He further testified that Cassandra died within an hour or two of the infliction of her injuries.

### Analysis

Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies. *See Bryant v. State*, 909 S.W.2d 579, 583 (Tex.App.—Tyler 1995, no pet.)(where evidence showed child had been left alone with defendant and injuries to child occurred approximately thirty minutes prior to child being brought to emergency room, evidence was sufficient to support conviction); *Elledge v. State*, 890 S.W.2d 843, 846 (Tex. App.—Austin 1994, pet. ref'd)(undisputed medical testimony placing adult defendant alone with child when fatal injuries were sustained supported conviction for injury to a child); *Butts v. State*, 835 S.W.2d 147, 151 (Tex.App.—Corpus Christi 1992, pet. ref'd)(injuries sustained by child established by medical testimony to have occurred at time adult defendant admitted to sole possession of child).

Here, the capital murder indictment alleged that Appellant caused the death of Cassandra, a child younger than six years of age, by shaking her. The evidence demonstrated that Appellant was alone with Cassandra when her injuries were sustained. Further, Appellant admitted to shaking Cassandra, to punching her in the stomach, and delivering a karate-type chop to her nose. We find that the evidence is sufficient for a rational trier of fact to conclude that Appellant caused his daughter's death. Appellant's fourth point of error is overruled.

## POST–SENTENCE VICTIM ALLOCUTION[1]

After punishment has been assessed and sentence pronounced, a court shall permit a victim, close relative of a deceased victim, or guardian of a victim to appear in person to present to the court and to the defendant a statement of the person's views about the offense, the defendant, and the effect of the offense on the victim. The person making the statement may not direct questions to the defendant nor may the court reporter transcribe the statement. Tex.Code Crim.Proc.Ann. art. 42.03, § 1 (Vernon Supp.2000). In his first and second points of error, Appellant complains that it was error for the trial court to allow Maria to exercise her rights under Article 42.03 because it violated Appellant's rights to due process and subjected him to double jeopardy and cruel and unusual punishment. Initially, we look at whether Appellant has preserved his complaint for appellate review.

### Preservation of Error

Appellant complains that his due process rights were violated because the court did not allow the court reporter to transcribe Maria's statement and because Maria was allowed to direct questions at him in violation of Article 42.03, sec. 1(b).

1. Texas appears to be the only state which allows victims to speak after sentence has been pronounced. *See* Keith D. Nicholson,

Tex.Code Crim.Proc.Ann. art. 42.03, § 1(b). In order to preserve a complaint for appellate review, the record must reflect that a timely objection was made to the trial court and that the complaining party received a ruling from the trial court on the objection. Tex.R.App.P. 33.1(a). While objecting to the court allowing the statement and ordering the Appellant to be present for the statement, Appellant made the following arguments:

APPELLANT: [B]ecause I will make an objection to. It says in my estimation, the Court shall permit, okay, to address. And permit is like you know, you can or you can't. You don't have to if you don't want to. The Court shall, you don't. The Court has to do it in my opinion because there has been—

COURT: Shall admit. Says shall be present, too.

APPELLANT: It says, that a person may present to the Court and so the defendant,—a statement, okay. It shall permit, I mean that doesn't mean you have to permit to do this and if requested no other word other than shall is enumerated there. And if you, the operative word is permit, Your Honor. I would, I would, I would certainly object to, especially to this. The court reporter shall not transcribe the testimony. I mean that's not—

COURT: Say may not, which is interesting.

APPELLANT: Well, the court reporter may not transcribe this statement.

COURT: That sounds kind of wishy-washy.

It appears that Appellant and the court were discussing the mandatory language of "shall" vis-a-vis the permissive language of "may" in the context of the transcription of the testimony. At no time did Appel-

*Would You Like Some More Salt With That Wound? Post–Sentence Victim Allocution in Texas*, 26 St. Mary's L.J. 1103, 1106 n. 9.

lant formally object to the lack of transcription. Although Appellant complained on the record about Maria's statement and her demeanor, he did not tender a bill of exceptions regarding what questions, if any, she directed to Appellant. Appellant has failed to preserve his complaint for appellate review. *See* TEX.R.APP.P. 33.1(a)(1).

We recognize, however, that to some extent Appellant has been placed in a classic "Catch–22" predicament. On the one hand, he wants to complain about the failure of the reporter to transcribe Maria's statement; on the other, he needs to demonstrate that he preserved error by timely objecting to the questions Maria directed toward him. In the interest of justice, we will address his specific contentions.

### Double Jeopardy

■ The double jeopardy clause of the United States Constitution embodies three protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense. *Illinois v. Vitale*, 447 U.S. 410, 415, 100 S.Ct. 2260, 2264, 65 L.Ed.2d 228, 235 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–65 (1969); *Ex parte Broxton*, 888 S.W.2d 23, 25 (Tex.Crim.App.1994). Since Appellant was not acquitted, nor was a second prosecution instituted after his conviction, it appears that Appellant is complaining that by subjecting him to the post-sentence victim allocution, he is suffering from multiple punishments for the same offense. However, even assuming that post-sentencing victim allocution is a form of punishment, there has been no violation of the double jeopardy clause.

**2.** Appellant proffers no argument or authority as to the protection offered by the Texas Constitution or how that protection differs from that guaranteed by the United States Constitution. Without such argument or authority, Appellant's point is inadequately briefed.

■ Double jeopardy describes the risk against the imposition of multiple criminal punishments for the same offense, but only when such occurs in successive proceedings. *Hudson v. U.S.*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997). In a single proceeding, the multiple-punishment issue is limited to ensuring that the total punishment did not exceed that authorized by the legislature. *U.S. v. Halper*, 490 U.S. 435, 450, 109 S.Ct. 1892, 1903, 104 L.Ed.2d 487, 503 (1989). Since a legislature may authorize cumulative punishment under two statutes for a single course of conduct, the multiple-punishment inquiry in the context of a single proceeding focuses on whether the legislature actually authorized the cumulative punishment. *Id.* at 1903 n. 10.

■ The punishment for capital murder where the State has not sought the death penalty is automatically set at life in prison. TEX.PENAL CODE ANN. § 12.31(a)(Vernon 1994). In addition, post-sentence victim allocution has been authorized by the Texas Legislature in all felony cases. TEX. CODE CRIM.PROC.ANN. art. 42.03(b). Therefore, pursuant to statute, once Appellant had been found guilty of capital murder, the trial court was mandated to sentence him to life in prison and to allow the post-sentence victim allocution. Since the trial court did not exceed the punishment as allowed by the legislature, there was no violation of the double jeopardy clause.

### Cruel and Unusual Punishment

■ Appellant's final complaint against post-sentence victim allocution is that it is cruel and unusual punishment under both the Texas and United States Constitutions.[2] We disagree.

*Matchett v. State*, 941 S.W.2d 922, 934 (Tex.Crim.App.1996); *Narvaiz v. State*, 840 S.W.2d 415 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

**408**

What is necessary to show sufficient harm for purposes of the cruel and unusual punishment clause depends upon the claim at issue. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156, 167 (1992). "The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should ... be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Id.; Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251, 261 (1986). Further, the Eighth Amendment's prohibition of cruel and unusual punishments " 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,' " and so admits of few absolute limitations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000, 117 L.Ed.2d at 167; *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59, 68 (1981).

The objective component of an Eighth Amendment claim is therefore contextual and responsive to "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000, 117 L.Ed.2d at 167; *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000, 117 L.Ed.2d at 167.

We find no case law regarding cruel and unusual punishment as it relates to post-sentence victim allocution. However, in the closely related area of the admission of victim-impact evidence at the punishment phase of criminal trials, the Supreme Court has held that the Eighth Amendment does not constitute a *per se* bar. *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991). The Court reaffirmed the view expressed by Justice Cardozo in *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934): "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Payne,* 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

The Texas Legislature specifically enacted Article 42.03 to allow victim statements only after sentencing in order to alleviate any risk that the statement would affect the partiality of the fact finder at the punishment phase. *See* Nicholson, 26 St. Mary's L.J. at 1114–15. Since the Supreme Court has determined that allowing victim impact evidence *prior* to sentencing does not violate the Eighth Amendment's prohibition against cruel and unusual punishment, we are hard-pressed to conclude that *post*-sentence victim allocution is a violation. Accordingly, Appellant's first and second points of error are overruled.

## CHALLENGE FOR CAUSE

In his third point of error, Appellant complains that the court erred in failing to grant a challenge for cause during voir dire. At the outset, we note that Appellant has failed to preserve error for review. In order to preserve error in the criminal context, an Appellant must: (1) use all of his peremptory strikes; (2) ask for and be refused additional peremptory strikes; and (3) be forced to take an identified objectionable juror whom Appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes. *Davila v. State,* 930 S.W.2d 641, 648 (Tex.App.—El Paso 1996, pet. ref'd).

From a careful review of the record, it appears that Appellant used only eight of his ten peremptory strikes. Further, Appellant did not identify an objectionable juror whom he would not have

otherwise accepted. Appellant's third point of error is overruled.

Having overruled all points of error, we affirm the judgment of conviction.