Opinion issued December 17, 2009




















In The
Court of Appeals
For The
First District of Texas







NO. 01-08-00738-CR
____________

DENNIS ANTOINE ANDRUS, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 339th District Court
Harris County, Texas
Trial Court Cause No. 1096647
 

 
 
MEMORANDUM OPINION
          A jury found appellant, Dennis Antoine Andrus, guilty of the offense of capital
murder of a child under the age of six years old


 and assessed his punishment at
confinement for life. In three issues, appellant contends that the evidence is factually
insufficient to support his conviction and his trial counsel provided ineffective
assistance of counsel. 
          We affirm.
Background
          Ashley Burnett, appellant’s wife, testified that on December 4, 2006, she and
appellant, a hemophiliac, lived in a two-bedroom, one-bath apartment with their two
children, Aja, who was two and one-half years old, and the complainant, who was
sixteen months old. That morning, Ashley, who worked as a certified nurse’s aide on
the 2 p.m. to 10 p.m. shift at an assisted living facility, fed the children breakfast and
spent about two hours playing with them in the living room. The complainant was
playing with her sister as she normally would. At noon, as was her routine, Ashley
put the children down for their nap on the living room floor in front of the television,
which was turned on. Ashley then began getting ready for work. Appellant, who was
in the bed in the master bedroom, got out of bed just before Ashley left for work at
around 1:40 p.m. When Ashley left, she noted that the children were still asleep on
the living room floor and appellant began vacuuming the apartment. Although the
facts are somewhat unclear as to the series of events that occurred after Ashley left
for work, it is undisputed that appellant was alone with Aja and the complainant
during that time. 
          Appellant testified that shortly after he began vacuuming, the children awoke. 
The complainant stood up from the floor, and appellant noticed that her diaper was
sagging. Appellant brought her to the couch, removed her diaper, and saw that the
complainant had both urinated and defecated in her diaper. Appellant used the
outside of her diaper to wipe the complainant but could not find another diaper in the
living room. He left her on the couch and told her to stay there. While he was out of
the living room, appellant heard no sound but that from the television. Appellant
went to the master bedroom in search of a fresh diaper. Not finding one there, he
went to the children’s room. After about three or four minutes, appellant returned
with the fresh diaper, whereupon he saw the complainant lying face down on the
floor. Appellant walked passed the complainant to the couch and called her to him. 
After the complainant did not respond, he then walked over to her and picked her up. 
Appellant noted that the complainant was limp and unresponsive and one of her eyes
was looking askew. Appellant immediately made a telephone call to Ashley and told
her that the complainant was unresponsive, but he communicated no reason for the
complainant’s condition. Ashley immediately returned home. 
          In the meantime, appellant tried to revive the complainant by kissing her,
touching her, and putting a wet washcloth on her face. Ashley returned about twenty
minutes after appellant had called her on the telephone. Ashley did not notice any
obvious injuries on the complainant. She also tried to revive the complainant by
kissing her. When the complainant did not respond, appellant, Ashley, Aja, and the
complainant proceeded to the LBJ Hospital Emergency Room. Appellant drove and
let Ashley, who was carrying the complainant, out at the front door of the hospital. 
Before parking the car, appellant went to get his cousin, who lived about five minutes
away, to help watch Aja. 
          LBJ Security Officer Michael Living testified that at LBJ Hospital, Security
Officer Damien Dickerson assisted Ashley in bringing the complainant into the
emergency room. After the complainant was taken to emergency room personnel,
Dickerson and Living went to see their supervisor, Sergeant Althea Covington, to
notify her to contact law enforcement authorities because the child had been injured. 
Living then went to his post at the parking lot booth. Subsequently another security
officer, dispatched by Sergeant Covington, came and told Living to be on the lookout
for a white car with a male driver and a child passenger and to bring them to the
emergency room. After appellant, his cousin, and Aja arrived in the car, they
followed Living into the hospital. Living noted that appellant did not have “as much
concern as [Living] would have [had]” and that appellant was not crying as he walked
into the hospital. 
          Sergeant Covington testified that she contacted an on site Child Protective
Services representative to interview appellant and Ashley. Covington noted that
appellant’s demeanor was not emotional while he was being interviewed, until the
representative’s questions became accusatory, and that Ashley’s demeanor was
“pretty calm,” which, in her opinion, was inappropriate. Shortly thereafter, Houston
Police Department (“HPD”) Patrol Officer C. Gallian arrived to investigate the
incident. 
          Officer Gallian testified that he was dispatched to the LBJ Hospital Emergency
Room in response to a call about a child suffering from “swelling in her brain for an
unknown reason.” Once there, Covington immediately directed him to Ashley and
appellant. Appellant told Gallian that he “thought [the complainant’s symptoms were
due to] a diaper rash,” that “[the complainant] didn’t have balance,” that “appellant
changed her diaper,” and that then “[the complainant] fell to her back and . . . her eyes
rolled back . . . one eye rolled back and . . . the other one was still open.”


 Gallian
noted that appellant did not tell him that the complainant’s diaper had been soiled or
that appellant had placed her on a couch. Gallian explained that appellant told him
that the complainant had acted unusually from “the second she awoke from her nap”
and that appellant “was with her when she basically just fell out on him.” 
          HPD Sergeant R. Parnell, assigned to the Child Abuse Unit, testified that she
further investigated the report that “the complainant was suffering from shaken baby
syndrome and had severe head trauma.” Ashley and appellant met Parnell at a police
station for an interview, which was recorded on video tape. Appellant told Parnell
that after the complainant awoke from her nap, he noticed that she had a soiled diaper. 
He took off the soiled diaper, left the complainant on the couch, went to get a fresh
diaper from the master bedroom, and returned to find the complainant face down on
the floor and unresponsive. Appellant restated that Ashley had already left for work
when the complainant became non-responsive. Appellant also stated that the
complainant “wasn’t active from the time she woke up” and “[the complainant was]
not acting like [herself].” After the interview, Parnell was informed by physicians at
Ben Taub Hospital, where the complainant had been transferred, that she had “lower
right side fractures on the back of her skull and a subdural bleed.” 
          Dr. Katherine King-Casas, the complainant’s treating physician at Ben Taub
Hospital, testified that the complainant had suffered from a broken left arm, a large
skull fracture and contusions on the right side of her head, a smaller skull fracture on
the left side of her head, and significant bleeding into her brain. Dr. King-Casas
admitted that the contusions would not necessarily have been visible to anyone until
the complainant’s head was shaved because the complainant had a full head of hair. 
She explained that the bleeding created extremely high pressure within the
complainant’s skull, which could cause further widening of any fractures and of the
spaces between the sutures on the complainant’s skull. Dr. King-Casas indicated that
the complainant was placed on a ventilator and had a catheter inserted into her skull
to reduce the pressure. She explained that, at that point, because of the pressure, the
complainant’s “chances of survival were very low.” Dr. King-Casas examined the
complainant’s eyes and saw multiple retinal hemorrhages. She explained that the
hemorrhages would not result from “one unidirectional fall [but] from shearing back
and forth movements.” Dr. King-Casas opined that all of complainant’s injuries were
“inconsistent” with an accidental fall. The complainant died on December 8, 2008.
          HPD Homicide Detective S. Straughter testified that after the complainant died,
he, along with HPD Homicide Detective J.C. Padilla and Sergeant Parnell, went to
appellant’s apartment to view the scene and interview appellant. The officers
recorded a scene video, having appellant describe what was being recorded and
explain what had happened. Straughter noted that appellant seemed calm and Ashley
was “upset and very disturbed.” On the video, appellant repeated what he had told
Parnell earlier and added that he also “picked [the complainant] up and . . . took her
into the room and . . . laid her across the bed” and that he “got a cold towel and laid
it across her face” to try to get her to respond. Straughter noted the height of the
couch from the seat to the floor to be fourteen and one-half inches and that the floor
was carpeted in the living room. He conceded that the height from the arm of the
couch to the floor was probably between eighteen and nineteen inches. 
          Assistant Harris County Medical Examiner Dr. Sara Doyle testified about the
complainant’s injuries and the cause of her death using twenty-seven autopsy
photographs to illustrate her testimony. Dr. Doyle explained that the complainant had
“four areas of bruising on the right side of [her] head” that became visible after her
head had been shaved. These contusions were “due to some type of impact” that
could be the result of up to “four separate strikes.” She also noted that the
complainant had a broken left arm. When Dr. Doyle peeled back the complainant’s
scalp to examine her skull, she saw a skull fracture on the right side—a “linear break”
through the parietal bone—that was in line with the externally visible bruising on that
side of the head. The complainant’s skull sutures had been separated in a “diastatic
fracture,” which had been caused by the force of a blow that fractured the right
parietal bone. However, some of the separation of the fractures and the sutures could
have resulted from the swelling and increased pressure in the brain, rather than from
the blow itself.
          Dr. Doyle additionally noted that the complainant had a “large right angle-shaped fracture . . . involving her left parietal bone” that extended into a suture, and
a separate fracture on the back of her head. She observed that the right angle-shaped
fracture was so severe that it split the left parietal bone into two pieces. The number
of fractures indicated to Dr. Doyle that “there were two or more separate impacts”
because those “two fractures can’t happen separately with one blow.” She explained
that the right-angled fracture was beveled, which usually occurs when “that portion
of the head is up against something while the other portion of the head is struck.” Dr.
Doyle opined that the injures were consistent with the complainant’s head being up
against the bed frame in the master bedroom and being struck repeatedly from the
other side.
          Regarding the complainant’s eyes, Dr. Doyle noted “numerous hemorrhages
all the way from the back to the front of [the complainant’s eyes] as well as folds in
the retina.” She explained that these hemorrhages “[were] associated with
nonaccidental inflicted head trauma” and were not consistent with injuries secondary
to a serious fall. Dr. Doyle opined that the eye hemorrhages were not likely to have
resulted from the hemorrhaging into the brain that caused the excess pressure in the
skull. Dr. Doyle further testified that she was “unsure exactly how much force would
be needed to make a person with severe hemophilia to bruise” and that an “adult
person that inflicts trauma on a child with a body part . . . may get bruising” but not
definitely, which may or may not require medical attention. 
          Dr. Doyle determined that the cause of the complainant’s death was “blunt
force head trauma” in which “the head was most likely on a supported surface on the
left and being struck on the right.” She opined that the complainant’s injuries were
inconsistent with a fall from the couch onto an object with a ninety degree angle
because such a fall “would not create the two separate fractures on the back side of
the head as well as the corner-shaped fracture on the top of the head.” 
          Dr. Jennifer Love, the Forensic Anthropology Director for the Harris County
Medical Examiner’s office, testified that she examined the complainant’s broken left
arm. She determined that the ulna was broken by an axial force that drove the bone
up towards the elbow, causing the bone to balloon outward and bend forward. 
Although Dr. Love indicated that such an injury was consistent with a person
catching herself with her hand while falling, the complainant’s broken ulna was
inconsistent with a fall from a couch onto a carpeted floor. However, the break was
consistent with a person putting out her hand to stop herself from being thrown, for
example, against a wall. Dr. Love determined that the fracture to the ulna occurred
around the same time as the complainant’s skull fractures. She also agreed with Dr.
Doyle that the complainant’s skull fractures were consistent with her having been hit
with nonaccidental blunt force on the right side of her skull while the left side of her
skull was up against something with a right angle. 
          Dr. Emanuel Escobar testified that appellant was a moderate hemophiliac who
had been treated five times at the Houston Hemophilia Center since 2000. He
explained that, due to appellant’s level of hemophilia, it was unlikely that appellant
would be susceptible to spontaneous bleeds, and, if appellant punched someone, his
necessity for medical treatment would depend on the severity of the trauma. Dr.
Escobar could not say whether or not appellant would have needed medical treatment
for his hand if appellant had punched a child. 
          Nelson Wayne May, Jr., appellant’s brother, testified that appellant was
“sweet” and “caring” with his children and had a reputation for honesty. Ashley
testified that appellant was helpful around the house and with the children. 
          Appellant testified that he routinely helped with the children and the
housekeeping. He further testified that any inconsistencies in his recounting of the
events that day were because he panicked and was being asked different questions by
different people for different purposes. He further testified that he was not a violent
person, and when he had gotten into fights, he had needed an infusion directly
thereafter. Appellant denied that he had gotten into several fights while held in the
Harris county Jail even though he had written his cousins to tell them about being in
fights at the jail. He then admitted that he had been a member of the gang the
“Bloods.” Appellant conceded that the complainant was fine before Ashley left for
work, that he was the only adult with the complainant after Ashley left, and that he
was the only adult nearby when the complainant became unresponsive.
Sufficiency of the EvidenceIn his first and second issues, appellant argues that the evidence is factually
“insufficient to support appellant’s conviction for capital murder” because “there is
not sufficient evidence that he committed the acts causing the death of the
complainant who was under the age of six (6) years” and “there is not sufficient
evidence the appellant possessed the requisite intent to cause the death of the
complainant.” 
          In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury’s determination, i.e., that the
verdict seems “clearly wrong and manifestly unjust,” or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
afford due deference to the jury’s determinations. Marshall v. State, 210 S.W.3d 618,
625 (Tex. Crim. App. 2006). The jury is free to accept some testimony over that of
other witnesses, including that of the defendant, and to disregard any inconsistencies. 
McKinny v. State, 76 S .W.3d 463, 468-69 (Tex. App.—Houston [1st Dist.] 2002, no
pet.). Although we should always be “mindful” that a jury is in the best position to
decide the facts and that we should not order a new trial simply because we disagree
with the verdict, it is “the very nature of a factual-sufficiency review that . . .
authorizes an appellate court, albeit to a very limited degree, to act in the capacity of
a so-called ‘thirteenth juror.’” Watson, 204 S.W.3d at 416–17. Thus, when an
appellate court is “able to say, with some objective basis in the record, that the great
weight and preponderance of the (albeit legally sufficient) evidence contradicts the
jury’s verdict[,] . . . it is justified in exercising its appellate fact jurisdiction to order
a new trial.” Id. at 417.
          “Texas case law is replete with holdings that when an adult defendant has had
sole access to a child at the time its injuries are sustained, the evidence is sufficient
to support a conviction for injury to a child, or murder if the child dies.” Garcia v.
State, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref’d); see Bryant v. State,
909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.); Butts v. State, 835 S.W.2d
147, 150–51 (Tex. App.—Corpus Christi 1992, pet ref’d). The requisite intent for
capital murder of a child under the age of six is not the specific intent to kill, but
whether the accused “acts knowingly, or with knowledge, with respect to a result of
his conduct when he is aware that his conduct is reasonably certain to cause the
result.” Rojas v. State, 171 S.W.3d 442, 446–447 (Tex. App.—Houston [14th Dist.]
2005, pet. ref’d). A jury may infer intent to kill from the nature of the injury inflicted. 
Wilkerson v. State, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994). A defendant’s
intent to kill may also be inferred from his words, acts, and conduct. Patrick v. State,
906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In circumstances where the defendant
is the only one with access to the child at the time the child sustains injuries, the jury
may consider inconsistencies in the defendant’s versions of events and the medical
evidence in determining guilt. Kemmerer v. State, 113 S.W.3d 513, 515–516 (Tex.
App.—Houston [1st Dist.] 2003, pet. ref’d). 
          In Kemmerer, the complainant child was walking, standing, sitting, playing,
and crying before being left in the sole care of the defendant, after which she received
a “severe, closed-head injury” that caused her death. Id. at 515. The medical
evidence showed that the complainant’s injuries were caused by “a forceful blow or
by severe shaking, rather than by a mere fall from a sofa to a carpeted floor, as some
of [the defendant’s] statements had suggested.” Id. The defendant’s version of the
events changed over time. Id. at 516, n.3. She originally stated that the child was
“fine” when she first took custody of her. Id. Later she stated that the child was
“fussy” when initially left in her care. Id. Another time she stated that the child was
“silently lying” on her mother’s shoulder with “blank open eyes” when she was
dropped off. Id. In upholding the defendant’s conviction, the court of appeals noted
that the jury was free to consider the defendant’s conflicting statements and the
medical evidence in finding the defendant guilty. Id. at 515. 
          In support of his factual sufficiency challenge, appellant emphasizes that he
“denied the commission of any act which might have caused his daughter’s death as
well as any intent for that result.” Appellant relies on evidence that he was an
involved father with the complainant; he had a good relationship with his family;
there was no evidence of prior abuse; when he realized the complainant was
unresponsive, he tried to awaken her and then immediately called his wife; his failure
to immediately call in emergency assistance was due to his panic; the complainant’s
injuries were not immediately obvious because of her full head of hair; and any
inconsistencies in his statements were because the statements were taken for different
reasons by different persons who asked different questions.
          Here, appellant’s story remained basically the same: the complainant was
napping and appeared physically fine before his wife left the complainant alone with
appellant to go to work; appellant began vacuuming, which awoke the complainant
whereupon appellant noticed that she had soiled her diaper; appellant removed the
diaper and set the complainant on the couch; he left the room to get a fresh diaper;
and when he returned, the complainant was face down and non-responsive on the
floor. Unlike the defendant in Kemmerer, appellant did not give significantly varying
stories about the complainant’s physical state before the injuries occurred or for how
the injuries occurred. He maintained that the complainant was fine before his wife
had left, that he did not inflict the injuries suffered by the complainant, and that he
did not know how the injuries were inflicted. 
          However, the record reveals that appellant did change his version of the events
from one interview to another. For example, appellant first told Gallian that the
complainant was on her back, and he later told Straughter that she had been on her
stomach. He told Gallian that the complainant had a diaper rash, but he then told
Straughter she only had a soiled diaper. Appellant testified that he called Ashley ten
minutes after she left for work, whereas Ashley testified that she was just pulling into
the parking lot of her workplace, which was twenty or thirty minutes away, when she
received appellant’s phone call. Appellant told Covington that the complainant fell
off the couch, but he later told Straughter that she was on the couch when he left but
on the floor when he returned. 
          Most important, however, the medical evidence established that the
complainant was subjected to severe blunt force trauma to the right side of her head
while the left side of her head was resting against a hard right-angled surface. The
State presented evidence that at least two blows were necessary to cause the injuries
to the right rear, back, and left sides of her skull. The treating physician, the medical
examiner, and the forensic anthropologist all testified that the complainant’s injuries
were “inconsistent” with an accidental fall onto a carpeted floor from a couch. The
treating physician and the medical examiner agreed that the hemorrhaging in the
complainant’s eyes also could not have been caused by an accidental fall. The
fracture on the left side of the complainant’s skull occurred as a result of great force
that split the left parietal bone into two pieces. Although the complainant’s left arm
was broken by a force that would be consistent with the complainant using her arm
to stop herself from falling, the medical examiner and the forensic anthropologist
explained that such an injury would not occur from a fall from a couch onto a
carpeted floor. The critical undisputed facts are that the complainant acted normally
before her mother left for work and her injuries occurred while she was in the sole
care of appellant.
          Viewing the evidence in a neutral light, a reasonable trier of fact could have
found beyond a reasonable doubt from the nature and severity of the complainant’s
skull fractures and broken left arm and from the fact that the complainant was acting
normally before being left in the sole custody of appellant, that appellant intentionally
or knowingly inflicted the injuries to the complainant’s skull, which caused her death. 
See Garcia, 16 S.W.3d at 405. Thus, we conclude that the verdict is not “clearly
wrong and manifestly unjust” and the proof of guilt is not against the great weight
and preponderance of the evidence. See Watson, 204 S.W.3d at 414–15. 
Accordingly, we hold that the evidence is factually sufficient to support appellant’s
conviction.
          We overrule appellant’s first and second issues.
Ineffective Assistance of Counsel
          In his third issue, appellant argues that his trial counsel rendered ineffective
assistance because he failed to contest the admissibility of gruesome autopsy
photographs.
          In order to prove an ineffective assistance of counsel claim, appellant must
show that his trial counsel’s performance fell below an objective standard of
reasonableness and, but for counsel’s unprofessional error, there is a reasonable
probability that the result of the proceeding would have been different. Strickland v.
Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Andrews v. State, 159
S.W.3d 98, 102 (Tex. Crim. App. 2005). Allegations of ineffectiveness must be firmly
founded in the record. Bone v. State, 77 S.W.3d 828, 833 & n.13 (Tex. Crim. App.
2002). When the record is silent, we may not speculate to find trial counsel
ineffective. Gamble v. State, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.]
1996, no pet.). In the absence of evidence of counsel’s reasons for the challenged
conduct, an appellate court commonly will assume a strategic motivation if any can
possibly be imagined, and will not conclude the challenged conduct constituted
deficient performance unless the conduct was so outrageous that no competent
attorney would have engaged in it. Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim.
App. 2001). Appellant must prove ineffective assistance by a preponderance of the
evidence and must overcome the strong presumption that counsel’s conduct falls
within the wide range of reasonably professional assistance or might reasonably be
considered sound trial strategy. Robertson v. State, 187 S.W.3d 475, 482–83 (Tex.
Crim. App. 2006); Gamble, 916 S.W.2d at 93. A failure to make a showing under
either prong defeats a claim for ineffective assistance. Rylander v. State, 101 S.W.3d
107, 110 (Tex. Crim. App. 2003). 
          Appellant contends that trial counsel failed to object to the admission of
gruesome autopsy photographs, specifically State’s Exhibits 37 and 38. He argues that
his trial counsel should have objected because “[b]oth depict the same injuries with
Exhibit 38 providing greater detail than 37” and “Exhibit 38 is further compromised
by the gruesome coloration surrounding the left eye.” He also asserts that “[t]he
prosecuting attorney exacerbated the inflammatory and prejudicial nature of State’s
Exhibit 37 by twice referring to it as ‘graphic.’” Exhibit 37 shows the skull with skin
pulled back revealing the sutures and the fracture on the right side of complainant’s
skull. Exhibit 38 shows the skull with the skin pulled back revealing the sutures and
the right angle-shaped fracture on the left side of the complainant’s skull. 
          In order to be admissible, photographs must be relevant to the solution of a
disputed fact issue. Lanham v. State, 474 S.W.2d 197, 199 (Tex. Crim. App. 1972). 
Here, appellant maintained that he did not know how the complainant was injured. 
Thus, the nature of the complainant’s injuries and her cause of death were at issue. 
Exhibit 37 is not duplicative of Exhibit 38, as appellant asserts, because each exhibit
shows a different side of the complainant’s skull. 
          Dr. Doyle used Exhibit 37 to explain that the parietal bone on the right side of
the complainant’s skull had a “linear fracture” that was caused by “some type of
impact or hit to the skull” and the sutures at the back of the skull were abnormally
separated in a diastatic fracture “consistent with a continuation of the force of the
[linear fracture] causing [the suture] to open up.” Dr. Doyle used Exhibit 38 to explain
that the parietal bone on the left side of the complainant’s skull had a “large right
angle-shaped fracture” that extended into a suture. While the photographs are
gruesome, they are no more gruesome than would be expected with injuries of the
nature suffered by the complainant. See Sonnier v. State, 913 S.W.2d 511, 519 (Tex.
Crim. App. 1995). Further, if verbal testimony is relevant, photographs of the same
are also relevant. See Gallo v. State, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). 
Dr. Doyle used the photographs to explain the nature and extent of the complainant’s
skull fractures and the cause of death and to support her opinion that neither fracture
could have been sustained by an accidental fall. 
          Because Dr. Doyle’s verbal testimony was relevant , the photographs were also
relevant. An objection to these photographs would likely have been futile. See id. 
Trial counsel is not ineffective for failing to undertake futile actions. See Mooney v.
State, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991). The record indicates that trial
counsel “had an opportunity to review [the photographs] and [trial counsel had] no
objection.” Because there is no evidence in the record that affirmatively demonstrates
that trial counsel’s failure to object to the photographs was deficient, we must heed the
strong presumption that trial counsel provided reasonable professional assistance.
          We overrule appellant’s third issue.
 

Conclusion
          We affirm the judgment of the trial court.
 
                                                                        Terry Jennings 
                                                                        Justice
 
Panel consists of Justices Jennings, Higley, and Sharp.
 
Do not publish. Tex. R. App. P. 47.2(b).