**Affirmed and Opinion Filed August 22, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01487-CR**

**DEMARCUS DEVONTE JOHNSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F18-00812-U**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Pedersen, III
Opinion by Justice Pedersen, III

Appellant Demarcus Devonte Johnson was indicted for the capital murder of a child under the age of ten. A jury found him guilty of the lesser included offense of injury to a child and found that he used or exhibited a deadly weapon in the course of that offense. Jurors assessed his punishment at fifty years' confinement. Appellant raises three issues on appeal, contending that the evidence is insufficient to support his conviction and arguing that the trial court erroneously admitted a chart created by the prosecutor and erroneously denied appellant's motion for continuance. We affirm.

## Background

The complainant in this case, A.F., was born in February 2016. At all relevant times, A.F. was primarily cared for either by her mother, (Mother) or by her father (Father) together with his mother (Grandmother). Father lived with Grandmother, and at times Mother also lived with them.

Mother and appellant had been friends during high school and reconnected around February of 2017. During the summer of that year, the two began spending more time together, and at times Mother stayed at appellant's home and left A.F. in his care while she worked.

On Wednesday, August 30, 2017, appellant was taking care of A.F. He called and told Mother that A.F. had fallen off the bed where he had put her to sleep and she had a "busted lip." Mother came home from work to check on the child, but A.F. would not stop crying, so Mother called Grandmother and asked her to come and get A.F. Grandmother was given directions to appellant's house, and Mother brought A.F. out to her. Grandmother had not been aware that Mother or A.F. had been staying at appellant's home. Indeed, Grandmother only learned later that Mother was not present when A.F. fell off the bed. Grandmother testified that A.F. was "very whiny" and had a swollen lip and a scratch by her nose, but she recovered.[1]

---

[1] The medical examiner testified that A.F. had suffered bruising to her liver and her brain approximately three to five days before her fatal injuries were inflicted, but those injuries had begun to heal and did not cause her death.

A.F. stayed with Grandmother and Father through Monday, September 4, which was Labor Day. According to Father, over the weekend A.F. was "[b]ack to being herself, playing, moving around, jumping, energetic." The trial court admitted a video taken by Grandmother on Labor Day, in which A.F. rolled around, laid on her belly, and responded to Grandmother's requests for the child to speak her name and to point to various body parts.

Mother asked Father to bring A.F. to appellant's home the next day. According to Father, he fed and bathed A.F. that morning; she had no marks or bruises on her body. He also testified that she behaved normally on the way to appellant's house: initially she sang along with music on the car ride, and subsequently, she fell asleep. Mother took her, sleeping, from the car. A.F. was awake and playing with Mother until she left for work at approximately 3:00 p.m.

During the rest of the day, A.F. interacted with a number of different people. Their testimony included the following observations:

- Karena Graham, a friend of appellant's, came by the house. She arrived around 10:00 a.m. and watched A.F. for about twenty minutes while appellant walked Mother to her bus stop. The child cried when her mother left, and Graham held her across her chest. When appellant returned he fed A.F. noodles, and she choked. Graham patted her back and cleared the noodles from the child's throat. Graham testified that other than the brief choking

episode, A.F. seemed fine: she observed the child sitting, standing, walking, and watching videos. Graham left the house shortly after 5:00 p.m.

- Morgan Hackney, a neighbor and friend of appellant's arrived at appellant's house at about 6:00 p.m. Appellant, his two-year-old son Carter, and A.F. were there, and the group planned to go to Chipotle's for dinner. A.F. walked to Hackney's car, and Hackney picked the child up and put her in the car. They got back to appellant's house about 7:15 p.m., and Hackney left.

- Appellant's sister (Dominiqua) came to his house around 8:00 p.m. to work on a homework assignment. She testified that when she arrived, A.F. and Carter were sitting on the couch, watching a video on a laptop. She said they "looked like a normal one-year-old and two-year-old just watching TV." They looked perfectly fine to her. She listened to music and worked on her homework in the living room.

- Appellant's younger brother (Deonte) lived with appellant. He arrived home from football practice after his sister arrived, and he put his football equipment away in a back room. Then he borrowed appellant's phone, got some chicken from the kitchen, and stretched out in the living room to eat and watch something on the phone.

Sometime after Dominiqua arrived, but before Deonte arrived, appellant picked A.F. up off the couch to change her diaper and to put her down to sleep for the night. Dominiqua gave A.F. a quick kiss and hug, and appellant took her to a

—4—

bedroom. Just before 9:30 p.m., appellant re-entered the living room and asked Deonte for the phone, saying he needed to call someone. Appellant then asked Dominiqua to come help him because A.F. was not breathing. Dominiqua initially believed appellant was joking, but then she responded that she didn't know how A.F. could have stopped breathing "if she was just fine like 20 minutes ago." When Dominiqua went with appellant she saw A.F. lying flat on her back on the floor; Dominiqua described the child's skin as "blue." Appellant called 911, and Dominiqua performed CPR on A.F. until the ambulance arrived and a paramedic took over.

A.F. was transported by ambulance to Baylor Hospital. Her heart beat was restored, and, shortly after midnight, she was transferred to Dallas Children's Hospital. However, she was not able to sustain breathing on her own, and she was attached to life support systems. Hospital personnel subsequently explained that there was nothing more they could do for the child, and Mother and Father agreed to remove her from life support. A.F. died at 4:52 a.m. on September 6.

Two experts testified at trial. Dr. Suzanne Dakil is the Director of the Reach Clinic at Children's Hospital and a professor of pediatrics at the University of Texas Southwestern Medical School.[2] She reviewed all of A.F.'s medical records from Baylor and Children's, and explained them to the jury. Dr. Stephen Lenfest, a Dallas

---

[2] According to trial testimony, the Reach team is the child abuse team at Children's Hospital.

County medical examiner, also testified concerning the autopsy he performed on A.F.

The experts identified three areas in which A.F. had sustained injuries: her abdomen, her head, and the bottom of her feet.

- The abdominal injuries included a severely torn liver and a transected pancreas. Tests showed significant damage to A.F.'s diaphragm, kidneys, intestines, and adrenal glands as well. These injuries would have caused her to experience extreme pain, nausea, and vomiting; she would have become more tired than usual, fussy, and non-cooperative. The injuries were the result of blunt force trauma and had caused close to half the blood in her body to bleed into her abdomen. This blood loss would have ultimately rendered the child unable to function.

- A.F. also suffered a very large depressed skull fracture, which was caused by a "significant force" against something with an edge. The force actually radiated across her skull. Beneath her skull, her brain was bruised, swollen, and bleeding. This injury would have immediately rendered A.F. symptomatic; she would have lost consciousness within the hour.

- Finally, A.F. had suffered more than 100 puncture wounds to the bottom of her left foot and the back of her left calf. The wounds were between one quarter and one half inch deep; bleeding indicated that

they were inflicted while she was alive. The wounds would have been very painful to a child and would certainly have kept her from walking in any normal fashion.

The experts agreed that either the abdominal or the head injuries would separately have been fatal. Together they were certainly fatal.

At the end of testimony, the jury found appellant guilty of injury to a child and found that he used a deadly weapon while committing that offense. Jurors assessed his punishment at fifty years' confinement.

This appeal followed.

## Sufficiency of the Evidence

In his second issue, appellant challenges the sufficiency of the evidence to support his conviction for injury to a child.[3] We review appellant's challenge by examining the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury exclusively determines the credibility of the witnesses and the weight to be given their testimony. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). We must ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. *Montgomery v.*

---

[3] We begin with appellant's second issue because, if sustained, it would lead to our rendering judgment in his favor. His first and third issues, if sustained, would yield only a remand for new trial.

*State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The trial court instructed the jury in this case that a person commits the offense of injury to a child "if he intentionally or knowingly causes serious bodily injury to a child fourteen years of age or younger." *See* TEX. PENAL CODE ANN. § 22.04(a)(1). Appellant acknowledges that the State's theory of his guilt is based upon his exclusive access to A.F. during a time period before she died. But he argues that A.F.'s fatal injuries could have been inflicted some six to eight hours before she became unresponsive and that other actors—namely Father or Graham—could have inflicted those injuries.

As to the timeline of A.F.'s injuries, the experts conceded that a child with her abdominal injuries could possibly survive six to eight hours before she became unresponsive. The medical examiner's testing established that A.F.'s abdominal injuries showed no inflammatory response; he testified that such a response would have begun, at the latest, eight hours after the injuries were inflicted. Therefore, he allowed that it was possible A.F. had lived up to eight hours after her abdominal injuries were inflicted.

The evidence related to A.F.'s head injuries, however, is dispositive in our analysis. Dakil testified that after the blow to her head, A.F. would immediately have

–8–

been "acutely symptomatic." According to Dakil, the child's brain would have begun to swell, and her bodily functions would have been impacted. Similarly, Lenfest testified that A.F. probably lost consciousness very rapidly after the head injury was inflicted "due to the sheer impact or force of the impact." At that point, A.F. most likely became unresponsive, and—based upon his analysis of the bleeding around her brain—her heart likely stopped beating. He opined that she could not have been conscious more than thirty minutes to an hour and she could not have behaved normally during that time period.

According to the expert testimony, then, A.F.'s head injury could not have been inflicted before appellant took her from the living room couch, where she was sitting, watching videos, displaying no acute symptoms of a severe head injury. According to Dominiqua's testimony, A.F. had sat on the couch and appeared perfectly fine, like a normal one-year-old, until appellant took her back to put her down to sleep.

Appellant points to evidence that, at times during the day, A.F. was sleepy or asleep. He urges us to identify those as times when A.F. was "unresponsive," and he argues that we should acknowledge the possibility that her injuries were inflicted before those events. But Lenfest made clear that "sleepy" is not the same as "unresponsive": unresponsive means unconscious. The first time there is evidence that A.F. was unresponsive is when appellant sought Dominiqua's help and called 911 because the child was not breathing. Dakil explained that none of the times when

A.F. slept during the day—only to awake and later walk or play or sit and watch videos—were indications of her injuries. She explained that once symptoms of these severe injuries begin, they only get worse.

When we view the evidence in the light most favorable to the jury's verdict, we conclude that A.F.'s fatal head injuries were inflicted between 8:00 and 9:30 p.m. that night. Once appellant took A.F. from the living room shortly after 8:00, no other person was with the child until she had stopped breathing and Dominiqua arrived to perform CPR. "When an adult defendant has sole access to a child at the time the child sustains the injuries, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.) (citing *Garcia v. State,* 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd)). We conclude a rational juror could find beyond a reasonable doubt that appellant intentionally or knowingly caused A.F.'s head injuries during the time period he was alone with her that night. *See Jackson*, 443 U.S. at 319. The evidence is sufficient to support appellant's conviction for injury to a child.

We overrule appellant's second issue.

### Admission of a Demonstrative Chart

In his first issue, appellant argues the trial court erred in admitting a chart made by the prosecutor setting forth a timeline of events testified to by the

witnesses.[4] The chart was expanded as witnesses testified to events' having occurred at different times from early morning on September 5 through the time of A.F.'s death on September 6. The chart was used for demonstrative purposes throughout trial. Appellant did not object as the chart was created that any entry was an incorrect representation of a witness's testimony. At the close of the State's case, the prosecutor offered the two-paged chart "for all purposes." Appellant's counsel initially stated, "It's demonstrative, Your Honor." The trial court responded that the State was offering the chart for all purposes, and appellant's counsel stated:

> I know. I think it's been generated by the district attorney and I don't think that it – it's her notes. I'm objecting to it.

The trial court overruled the objection.

On appeal, appellant makes a number of arguments: the chart is an improper summary of voluminous evidence under Texas Rule of Evidence 1006; the evidence is irrelevant as a mere summary of other evidence already before the jury; the chart improperly bolsters other testimony; and the chart undermines article 36.28's requirement that testimony not be read back to jurors unless they are in disagreement about that testimony. None of these arguments addresses appellant's actual objection, that the chart was created by the prosecutor as a record of her notes.

---

[4] The handwritten chart extends over two pages and was marked on each page as a separate exhibit. Thus, appellant's complaint includes both exhibits numbered 100 and 101, but we treat it here as a single document.

An appellate issue must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). The objection must "state[] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *see also Clark*, 365 S.W.3d at 339. Thus, although appellant's issue is not required to mirror the words of his objection, the trial court must have been made aware that appellant sought a ruling addressing rule 1006, or relevance, or bolstering, or article 36.28. We conclude that neither appellant's objection nor its context apprised the trial court of these complaints.

Appellant has not preserved his complaints to the admission of the chart for all purposes. We overrule his first issue.

## Motion for Continuance

In his third issue, appellant contends the trial court erroneously denied his October 18, 2019 First Motion for Continuance and his October 24, 2019 Request for Reconsideration. After appellant's request was denied, trial began—as it had been scheduled—on October 28, 2019. We review a trial court's denial of a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007).

Appellant's motion was based on the unavailability of his expert witness, Dr. Janice Ophoven. According to appellant, Ophaven was appointed by the trial court

–12–

on January 22, 2019, and she consulted with the defense in March of 2019. It appears from the record that trial was then set for early May of that year. On May 1, 2019, appellant filed a Motion for Continuance. He explained his need for a continuance in a single sentence:

> Defendant's expert witness has not had adequate time to analyze the voluminous amount of discovery in this case and Defendant anticipates that she will need an additional 90 days to make her[] findings in this case as she will need additional evidence from the Dallas County Medical Examiners Office.

The record does not contain a signed order granting this motion, but we know trial was subsequently re-set for October 28, 2019, significantly more than ninety days after the early-May setting. The record is then silent concerning appellant's expert until ten days before the October setting, when appellant sought another continuance.[5] Appellant complains that he "was not able to procure another expert in a short amount of time: from October 18, 2019 (denial of the continuance) to October 28, 2019 when the trial began."

At the outset, we conclude that appellant's reliance on *Ake v. Oklahoma*, 470 U.S. 68 (1985) and *Rey v. State*, 897 S.W.2d 333 (Tex. Crim. App. 1995) is misplaced. Those cases do assure a defendant the ability to procure expert testimony when it is necessary to assist him at trial. *Ake*, 470 U.S. at 83; *Rey* at 338. Here,

---

[5]  The State's brief asserts that this motion was filed on July 17, 2019, which is the date typed in the motion's certificate of service. However, appellant acknowledges the motion was not filed until October 18, and the motion confirms that it was "[e]xecuted on the 18th day of October 2019," the same day it was denied by the trial court.

appellant requested and was granted the assistance of a forensic expert. The trial court complied with the dictates of *Ake* and *Rey*.

The question, then, is whether appellant complied with the requirements to obtain a continuance of his trial. "A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PRO. ANN. art. 29.03. The single cause urged for appellant's continuance was the unavailability of Ophaven. But appellant's motion did not explain the diligence he had used to obtain Ophaven's testimony for the scheduled trial date. *See id.* arts. 29.06.2 (in defendant's first motion for continuance due to absence of a witness, the motion must show "[t]he diligence which has been used to procure his attendance"), 2907 (in defendant's subsequent motion for continuance, he must show the same "requisites"). Nor has appellant described a diligent search for a replacement expert once he learned of her unavailability. *See id.*; *see also Ake*, 470 U.S. at 83 (defendant is not entitled to expert assistance of particular witness).

We conclude the trial court did not abuse its discretion in denying appellant's motion for continuance. We overrule his third issue.

### Conclusion

We affirm the trial court's judgment.

191487f.u05
Do Not Publish
TEX. R. APP. P. 47

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

–14–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DEMARCUS DEVONTE
JOHNSON, Appellant

No. 05-19-01487-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F18-00812-U.
Opinion delivered by Justice
Pedersen, III. Justices Myers and
Partida-Kipness participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of August, 2022.