In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00234-CR
_____

**DEWAYNE MCKINLEY BYRD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 11166**

**MEMORANDUM OPINION**

A jury found DeWayne McKinley Byrd guilty of the offense of injury to a

child, K.W. *See* Tex. Penal Code Ann. § 22.04 (a)(1), (e) (West Supp. 2012).[1] The

jury assessed punishment at 99 years confinement. In three issues, Byrd argues (1)

the evidence is insufficient to support his conviction; (2) the prosecutor committed

---

[1] Although section 22.04 of the Penal Code was amended in 2011, we cite to
the current version of the statute because the subsequent amendments do not affect
the outcome of this appeal.

1

reversible error in making comments to the jury about Byrd's failure to testify; and (3) Byrd received ineffective assistance of counsel. We find Byrd's issues are without merit and affirm the judgment.

## Background

Byrd lived in a home with his biological son, K.W.'s mother, and K.W. On January 25, 2011, K.W.'s mother left him in Byrd's care. K.W.'s mother left their apartment by 8 a.m. to attend a class at Lamar University. At the time she left, K.W. was sitting on the couch, watching television. K.W. could walk, eat, and play like a normal two-year old child. K.W.'s mother returned home that afternoon between 12:30 p.m. and 1:00 p.m. Upon her return, Byrd checked on K.W., grabbed his keys, gave her a goodbye kiss, and then left. K.W.'s mother described Byrd's demeanor as "frantic" and "nervous." After Byrd left, she heard K.W. moaning in his sleep, and found that she could not wake him. She simultaneously called 9-1-1 on the house phone and Byrd on her cellular phone. Byrd returned to the apartment. When the paramedics arrived, they found K.W. unresponsive. The paramedics noted multiple bruises on K.W. and suspected child abuse. Byrd told the paramedics that K.W. had fallen earlier in the day and would not wake up from his nap. Because of the severity of his injuries, K.W. was ultimately life-flighted from Beaumont to Texas Children's Hospital in Houston.

2

Dr. Marcella Donaruma, a child abuse pediatrician at Texas Children's Hospital, testified as a consulting physician for K.W. She testified that when K.W. arrived at the hospital, he was in critical condition. K.W.'s injuries were life threatening, and he was on life support. K.W. presented with a number of injuries; including, acute subdural hemorrhage bilaterally, diffuse cerebral edema, a scalp hematoma, retinal hemorrhages bilaterally, and bruising all over his head. The doctor testified that K.W. would have immediately become symptomatic from this trauma, that he was likely immediately unconscious, and would have appeared in need of medical attention. The doctor equated the level of injuries K.W. suffered to those one would expect from a major motor vehicle collision, a fall from several stories, being hit by an automobile, or being hit in the head with a fist. K.W. also had bruising on his shoulder blade, his buttocks, and on the backs of his legs, which could have been caused by impact from a fist. Additionally, K.W. suffered a lacerated liver, an injured pancreas, and bleeding from one of his adrenal glands, all of which could have been caused by striking or kicking the back and stomach of the child.

The doctor also testified that in her medical opinion, K.W. was "battered by an adult." She testified that another child could not have caused K.W.'s injuries, that his injuries could not have been accidental, nor could a spanking with a belt

have caused all of K.W.'s injuries. The doctor was adamant that K.W.'s injuries could not have been caused by a short fall, or from rough play with another child. She identified additional injuries that repeated beating with a belt could have caused in the lower half of K.W.'s body. She also identified some injuries that could have been caused by use of a cold iron or a shoe. The doctor expressed surprise that K.W. survived, considering the extent of injuries he endured.

According to K.W.'s father, he can no longer talk, he cannot walk, nor can he eat without a feeding tube. K.W. sees only shadows with his left eye, and his right eye is blind. He is chronically ill because of his disabilities. He has seizures, muscle spasms, and lives with pain daily. While K.W. is four years old, he now has the mental capacity of a six-month old child.

## Sufficiency of the Evidence

In his first issue, Byrd challenges the sufficiency of the evidence to support his conviction for injury to a child. A reviewing court should apply the *Jackson v. Virginia* legal-sufficiency standard to determine the sufficiency of the evidence to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). We evaluate all the evidence in the light most favorable to the verdict to

4

determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the jury's responsibility to fairly resolve conflicting testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13.

A person commits the offense of injury to a child "if he intentionally [or] knowingly . . . causes to a child . . . (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." Tex. Penal Code Ann. § 22.04(a). The trial court used language in its jury charge that appropriately tracked this language. *See id.* Byrd does not contest that K.W. suffered serious bodily injury; rather, Byrd claims that the evidence is insufficient to prove that he caused the injury.

In support of its case, the State presented a number of witnesses at trial. The upstairs neighbor testified that around 7:15 a.m., she overheard a man in the downstairs apartment using foul language and aggressively yelling at someone for having urinated on himself. She testified that she also heard the sound of running water and a crying child coming from the same apartment. She recalled that the child started screaming and that it sounded like the child was slipping and falling

in the bathtub. She heard the slipping and falling sound four or five times, and after each time, the child's screams would get louder. From the sounds she heard, the neighbor believed the man was disciplining the child while the child was bathing. The neighbor estimated that the incident lasted from about 7:15 a.m. to 7:55 a.m. that morning. She recalled that towards the end of the incident, it sounded as if the child had moved from the bathroom to a bedroom and had become quieter until the child was silent. She testified that she did not hear a female's voice that morning.

K.W.'s mother testified that she awoke around 7:50 a.m. Because her class began at 8:30 a.m., she needed to leave her apartment by 8 a.m. Her college professor testified and confirmed that she attended his class that day. He testified that his class met on Lamar's campus at 8:30 a.m., they left campus at 10 a.m. and travelled to Nederland to student teach, where they concluded class at 11:50 a.m.

K.W.'s mother testified that she had been trying to potty train K.W. She would normally punish K.W. for having an accident by either fussing at him or whipping him. When she whipped K.W., she did so with a belt or with her hands. She estimated that she spanked K.W. twice a week for having accidents. She admitted that she had whipped K.W. the day before the incident because he had a potty-training accident. She explained that when she discovered he had had an

6

accident, she put him in the bathtub. While in the bathtub, K.W. had another accident, so she removed him from the bathtub and whipped him on his buttocks. She testified that she had not observed any bruises on him at that time, nor did she cause any bruising by whipping him.

On the morning of this incident, she checked to see if K.W. had had an accident and discovered that he had. She denied punishing K.W. that morning though, and explained that she had not had time to punish him because she was in a hurry to get to class. When she left the apartment, Byrd was awake, but was still in bed. K.W.'s mother admitted that when she originally gave a statement to the police, she told them that K.W. was asleep when she left the apartment. She explained that she said this to the police because she was concentrating on how she found K.W., not on how she had left him earlier that morning. K.W.'s mother testified that Byrd did not whip K.W. before she left for school that morning, and to her knowledge he had never before whipped K.W. Finally, while she admitted that she too had been charged with injury to a child, K.W.'s mother denied causing any of K.W.'s injuries.

K.W.'s mother testified that she believes that Byrd whipped K.W. on that morning for having had an accident. She recalled that while they were at the hospital, Byrd told her that he "'didn't have a reason to whip [K.W.] today'" since

7

K.W. had not had an accident in the bed. But she knew otherwise; she knew K.W. had had an accident that morning. She also recalled that when Byrd had returned to the apartment that afternoon and tried to wake K.W, Byrd stated, "'He is still not waking up. I'm not going to play rough with him no more.'" Byrd also said, "'I was just trying to toughen him up.'" She recalled that when K.W. would "whine" to her, Byrd would tell K.W., "'Man, you got to toughen up. You got to be a man.'" K.W.'s mother also testified that Byrd did not get along with K.W.'s father. K.W.'s father confirmed her testimony about his relationship with Byrd. K.W.'s father testified that approximately six to nine months before this incident, Byrd started a fight with him.

A Department of Family and Protective Services (DFPS) worker testified that Byrd came to her office the day after the incident to check on his own son's placement with the Department. The DFPS worker recalled some unsolicited statements Byrd made to her. He commented to her, "'he was going to go away for a long time.'" When asked what he meant by that statement, Byrd responded, "'I just need to get a lawyer.'"

Leeland Keen, a Beaumont police officer, testified that he investigated K.W.'s case. As part of his investigation, he interviewed Byrd. Keen testified that he read Byrd his rights, but Byrd waived his rights and chose to speak to him.

8

Keen asked Byrd what had happened to K.W., Byrd told Keen that he did not know what caused K.W.'s injuries. Byrd recalled that his toddler son had struck K.W. with a toy fire truck. Keen testified that Byrd never implicated K.W.'s mother in causing the injuries to K.W. Byrd told Keen that K.W.'s mother left the apartment to go to her class at Lamar before he woke up that morning. Byrd told Keen that K.W. had gotten up that morning, had acted normal, and had eaten breakfast. Byrd stated that he woke up because he heard K.W. "screaming and crying" and found K.W. and his son together. But Byrd also told Keen that when he awoke, the two boys were asleep in their bed. Byrd told Keen that he had given K.W. a bath that morning because he had vomited, and did not see any bruises on K.W. while he bathed him. Byrd told Keen that after K.W. had finished his bath, K.W. laid down on the couch, and fell asleep. Byrd told him he then brought K.W. to his bed. Byrd told Keen that K.W.'s mother returned from her class between 1:15 p.m. and 1:30 p.m. Byrd told Keen that he was the only adult with K.W. while the child's mother was gone that day. Keen recalled that Byrd stated, "'I'm going away for a long time.'"

Keen testified that K.W.'s mother gave several statements during the course of the investigation and in none of them did she indicate that Byrd hit K.W.

9

Dr. Donaruma was able to rule out that K.W.'s injuries were caused by accident or any natural causes. She also testified that the injuries were so severe that K.W. would have immediately become symptomatic. Additionally, the State presented evidence that as time passed and the extent of K.W.'s injuries became known, Byrd's version of what happened that day changed—first he told K.W.'s mother that he had played too rough with K.W., he then told the paramedics that K.W. had fallen; and he told Officer Keen that his son hit K.W. in the head with a toy fire truck. Byrd commented to both an officer and to a DFPS worker that he was "going away for a long time." While there is some discrepancy in the time that the neighbor testified she heard yelling from Byrd's apartment and the time that K.W.'s mother testified she left to attend school, the jury could have reasonably believed the child's mother's testimony that she left prior to any yelling or abusive behavior.

After reviewing the record, we hold that the evidence was sufficient for a jury to find Byrd guilty of the elements of the crime beyond a reasonable doubt. The jury was entitled to believe that K.W.'s mother left K.W. in Byrd's care in a healthy, normal condition. The evidence is undisputed that Byrd was the only adult with K.W. from the time K.W.'s mother left that morning until she returned that afternoon to find K.W. severely injured. The physician from Texas Children's

10

Hospital agreed that K.W.'s injuries were consistent with recent, serious trauma, which she identified as child abuse. "'Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time [the child's] injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies.'" *Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (quoting *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd)).

Based on this record, as sole judge of the weight and credibility of the testimony, the jury could reasonably believe that Byrd battered K.W., which caused K.W.'s injuries. *See Hooper*, 214 S.W.3d at 13. Viewing the evidence in the light most favorable to the verdict, the evidence is sufficient to show beyond a reasonable doubt that Byrd committed the offense of injury to a child. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Bearnth*, 361 S.W.3d at 140; *see also* Tex. Penal Code Ann. § 22.04 (a)(1). We overrule issue one.

### Improper Jury Argument

In Byrd's second issue, he argues the prosecutor committed reversible error in making a comment on Byrd's right to remain silent. Byrd exercised his Fifth Amendment right not to testify at both the guilt and innocence phase and the

11

punishment phase of trial. During the prosecutor's closing argument at the punishment phase of trial, the prosecutor stated:

> [Defense counsel] knows me well. He knows I am going to get up here and laugh at the idea that he asks for probation. He knows that I am going to stand up here and get angry that he is asking you to give him probation. It does make me angry. It should make you angry. This is not a probation case. No way; no how. Why would you give him probation? What has he done to deserve probation? What has he done to deserve to spend anything less than the rest of his life in jail? Beg forgiveness? Apologize to the family? Own up to it? No. No. He forced you to hold him accountable. Dewayne Byrd doesn't take responsibility for anything. This isn't a probation case.

Byrd did not object to these statements.

Jury argument is permissible when it falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to arguments of opposing counsel; and (4) pleas for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law." *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *see also* U.S. CONST. amend. V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005). Yet to preserve error in jury argument, a defendant must contemporaneously object to the statement and obtain an adverse ruling. *Cooks v. State*, 844 S.W.2d 697, 727 (Tex. Crim. App. 1992). An appellant forfeits any claim that a prosecutor's comments strayed outside the confines of the

four permissible categories if he failed to make a contemporaneous trial objection. *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (citing *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)). Because Byrd did not object to the prosecutor's comments at trial, he has not preserved this alleged error for review. *See id.*; *see also* Tex. R. App. P. 33.1.

If Byrd's trial counsel had preserved this issue for review, without deciding whether the prosecutor's comments were an improper comment on Byrd's failure to testify, we conclude that any error would have been harmless. *See* Tex. R. App. P. 44.2(a); *Wimbrey v. State*, 106 S.W.3d 190, 192 (Tex. App.—Fort Worth 2003, pet. ref'd). Under Texas Rule of Appellate Procedure 44.2(a), if we determine constitutional error exists, we should not reverse the judgment unless we determine beyond a reasonable doubt that the error contributed to the defendant's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Wimbrey*, 106 S.W.3d at 192. Our primary concern is the effect the error had, or reasonably may have had, on the jury's decision. *Wimbrey*, 106 S.W.3d at 192 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g)). In deciding whether trial error contributed to a defendant's conviction or punishment, we consider the nature of the error, the State's emphasis of the error, the error's probable collateral

13

implications, and the weight a juror would probably place on the alleged error. *Snowden v. State*, 353 S.W.3d 815, 821-22 (Tex. Crim. App. 2011).

Our review of the entire record demonstrates that these comments were a small part of the State's argument and were not emphasized or mentioned again and that a juror would probably not attribute much, if any, weight to the error. *See id.* Additionally, the trial court's charge included an instruction not to consider Byrd's failure to testify, and the jury is presumed to have followed these instructions. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). We overrule Byrd's second issue.

### Ineffective Assistance of Counsel

In his third issue, Byrd contends that his counsel was ineffective for failing to object to the prosecutor's improper comments regarding his failure to testify. To prevail on a claim of ineffective assistance of counsel, an appellant must show (1) that counsel's performance was defective, i.e. counsel made such serious errors that counsel was not functioning effectively as counsel, and (2) that counsel's deficient performance prejudiced his defense and deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). "[A]ppellant must show a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Thompson*, 9 S.W.3d at 812. The defendant has the burden to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 813. A defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *see also Thompson*, 9 S.W.3d at 813. "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 813.

The record is silent as to why Byrd's trial counsel did not object to the prosecutor's comments. Byrd did not file a motion for new trial or otherwise create a record to demonstrate counsel's reasons for not objecting. Byrd argues that there can be no logical explanation for his trial counsel's failure to object to the prosecutor's comments. But Byrd gives no reason why it could not be part of a trial strategy. Trial counsel may have decided against objecting to avoid further emphasizing the comments. *See Castoreno v. State*, 932 S.W.2d 597, 603 (Tex. App.—San Antonio 1996, pet. ref'd). Because the record here is silent as to trial counsel's strategy, we would have to speculate to find trial counsel ineffective based on the asserted grounds, which we cannot do. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). We overrule Byrd's third issue.

15

Having overruled each of Byrd's issues, we affirm the trial court's judgment.

AFFIRMED.

_____

CHARLES KREGER
Justice

Submitted on March 19, 2013
Opinion Delivered May 15, 2013
Do not publish

Before McKeithen, C.J., Gaultney and Kreger, JJ.