COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ASHLEY RAMIREZ, | § | |
| | | No. 08-17-00122-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 205th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20160D01471) |
| | § | |

## **O P I N I O N**

Ashley Ramirez was convicted by a jury of two counts of causing injury to her nearly 15-month old child, A.L.[1]  At trial, the State presented a case primarily composed of medical testimony centered on the non-accidental nature of A.L.'s injuries, their degree of severity, and  the likely timing of when they were sustained, based on treatment provided to A.L. after Ramirez took him to a local hospital.  Although Ramirez denied ever causing harm to A.L., she also claimed to be his sole caregiver and the only person who had access to him during the critical time in which his injuries were sustained.  On appeal, Ramirez presents two issues challenging the legal sufficiency of the evidence to uphold her conviction.  We address both issues together. Finding no error, we

---

[1] To protect the identity of the victim who was a minor at the time the offense was committed, this opinion will refer to him by his initials, A.L.  *See* TEX. R. APP. P. 9.10(a)(3), (b)-(d).

affirm.

## BACKGROUND

Viewing the evidence in the light most favorable to the jury's verdict, the record presented the following sequence of events.

### The Events Prior to A.L.'s Hospitalization

On September 25, 2014, Ramirez took A.L., then almost 15-months' old, to her family's long-time pediatrician, Dr. Luis Muñoz. At the visit, Ramirez reported that A.L. had a cough, temperature, and runny nose. Based on her reported symptoms, Dr. Muñoz focused his examination on determining whether A.L. had an ear, throat, or chest infection. The abbreviated exam did not include a full head-to-toe assessment. Ultimately, Dr. Muñoz diagnosed A.L. with having an ear infection, and he made no other significant observations.

Nearly a week later, on September 30, 2014, Ramirez returned with A.L. for a physical examination and immunizations. Dr. Muñoz testified that he typically recommends a return visit the following week if he notices that a child has any missed immunizations. A.L.'s medical record showed he followed that pattern of care; A.L. had not been seen for a wellness check-up since he was two months of age. Records showed, however, he had been seen two other times when he was sick in January and February of 2014.

At the immunization visit, Ramirez additionally mentioned that she had concerns about A.L. bruising and crying "all the time." Dr. Muñoz's record noted, "No bruises seen in physical exam." Due to Ramirez's concern, however, Dr. Muñoz ordered additional testing: blood work to rule out illnesses such as leukemia or thrombocytopenia; and a skeletal survey, or whole-body x-rays, to look for injuries. With a reported history of bruises and crying, Dr. Muñoz explained he

2

wanted to make sure there were no injuries as it would not be unusual for a child of A.L.'s age to have accidents. Dr. Muñoz gave orders for Ramirez to go to the hospital for x-rays and lab work. After that visit of September 30, Dr. Muñoz had no further contact with Ramirez or A.L. until he received a call from the hospital on October 8. Dr. Muñoz testified he did not feel it was unreasonable for Ramirez to wait eight days to get the x-rays he had ordered, but he also clarified that waiting would not be reasonable when a child stops walking after having previously begun walking.

*A.L.'s Hospitalization and the Ensuing Law Enforcement Investigation*

On October 8, 2014, Ramirez took A.L. to Las Palmas Medical Center Emergency Department (Las Palmas), where he was seen by Sunny Baker, a licensed physician's assistant whose training included completion of medical school and specializing in emergency medicine. Baker met with Ramirez, who had A.L. with her, and documented her observations and findings in the electronic medical record of the hospital. Ramirez reported that she brought A.L. in because she believed he had pain in his left leg as she noticed he had stopped walking days prior. Baker also noted that Ramirez mentioned other symptoms including: "a fever, decreased activity, won't walk, crying, fussy." Ramirez also reported that A.L. did not attend daycare and there were no others who cared for him. Ramirez reported she was unaware of any trauma.

Baker testified at trial that she believed A.L. appeared slight and small for his age. Upon examining him, Baker saw two to three bruises and one abrasion on A.L.'s back, one bruise spanning across his chest, multiple smaller bruises on his shoulder, and a lump on his lower left leg that was raised and felt abnormal. According to Baker's understanding of how bruises behave, Baker believed A.L.'s bruises were greater than a day or two old. Baker ordered x-rays based on

3

Ramirez's report that A.L. was not walking, and because Baker had noticed a lump on his left lower extremity. X-rays revealed that A.L. had a fractured femur and a fracture of ribs. To stabilize the fracture to his leg, A.L. was fitted with a splint.

Based on her training, Baker testified that she had felt that A.L.'s injuries could be due to abuse. She felt obligated to report A.L.'s injuries, so she called CPS, documented her call, and discussed the case with her attending physician. Baker explained that the femur is a very large and sturdy bone that would require a great deal of force to fracture, and such a fracture was not the sort that a two-year old child could inflict on himself. Baker also testified that rib injuries would bruise and cause pain and tenderness immediately. Rib injuries would make it hurt to be touched, to be picked up, to cough, and to breathe. Baker also believed that a child who was normally walking but who had stopped walking should have presented enough of a concern for a caregiver to seek medical care.

Frankie Carreon, an investigator with Child Protective Services, immediately responded to Las Palmas after receiving a high priority call involving a serious injury to a child. Upon her arrival, Carreon first spoke to medical staff then went to see A.L. When Carreon saw A.L., she noted he had a weak, whimper-like cry, and any movement he made appeared to cause him pain. She added that he looked thin, frail, and weak, with several bruises around his face, chest, and back, and his left leg was already wrapped due to his fracture.

After seeing A.L., Carreon spoke to Ramirez. Carreon described Ramirez as being cooperative throughout their conversation. Ramirez told Carreon that she was A.L.'s primary caregiver and that A.L.'s father was an absent parent with whom she had not spoken to for a long time. Ramirez did not know where A.L.'s father lived or how to contact him. Ramirez told

4

Carreon she was the only person who currently cared for A.L, although her sister had previously helped her. After losing her employment earlier in the year, in June or July, Ramirez became A.L.'s primary caregiver and stayed home with him on a full-time basis. Carreon testified that Ramirez described herself as the person caring for A.L. "day in and day out."

Carreon testified that Ramirez told her she had brought A.L. to the hospital because he began crawling instead of walking and displayed some discomfort to his left leg where it appeared he was very sensitive to touch. When Ramirez tried to get A.L. to stand, he appeared to be in pain and could not put pressure on his leg. Ramirez had seen a bruise on his left leg that she tried to massage, but her touch caused him to cry. She ultimately decided to take him to the hospital when he developed a fever. Ramirez told Carreon that A.L. had been immobile for the past 48 hours.

When Carreon probed into how A.L. was injured, Ramirez explained that he might have gotten his leg fracture from a futon couch that folded out into a bed on which he slept. Ramirez thought that A.L. might have gotten his leg lodged between one of the metal bars upon which the mattress rested. Other than that, Ramirez had no other explanation to give for his injury.

During the time that Carreon was at the hospital, she never saw Ramirez interacting with A.L. or holding him directly. Carreon testified that Ramirez did not appear to express any urgency towards the situation and seemed to have no sense of concern for what was happening. Ramirez also spoke to Carreon in a "flat" and "monotone" fashion when discussing A.L.'s injuries. As part of her standard protocol in cases involving serious injuries and suspected abuse Carreon eventually called law enforcement. Later she also spoke with potential witnesses such as Ramirez's mother, her boyfriend, and her pediatrician, Dr. Muñoz.

Along with other members of the El Paso Police Department, Detective Tanya Rohwer and

5

Detective Snow responded to a call at Las Palmas in the morning hours on October 9. The call indicated that a child victim sustained multiple injuries to his ribs and fractures to his left leg and that the child was receiving medical care at the hospital. Upon arriving at Las Palmas, the detectives spoke with a nurse to get a medical update on the child, and they then entered A.L.'s hospital room where they saw A.L., Ramirez, and Ramirez's then-boyfriend at the time. While A.L. was lying in bed, Ramirez was sitting with her boyfriend and not showing much emotion.

Detective Rohwer testified that she introduced herself to Ramirez and explained why she was called out to the scene. When Detective Rohwer asked Ramirez about why she took A.L. to the hospital, Ramirez did not respond, and her boyfriend interjected. Detective Rohwer did not ask Ramirez any further questions, and the two detectives exited A.L.'s room while waiting for the crime scene unit to respond and photograph A.L. Detective Rohwer then contacted potential witnesses, including Dr. Muñoz, Ramirez's mother, and doctors at Las Palmas. Eventually, Detective Rohwer approached Ramirez again in the afternoon to ask if she would provide a statement. Initially, Ramirez said that she would have to wait until the next day so that someone could stay with her son. But Ramirez later approached Detective Rohwer and offered to give a statement because her sister had arrived at the hospital to watch over A.L. Detective Rohwer testified that Ramirez did not appear hesitant to give her statement. Ramirez then met with Detective Rohwer at the police headquarters in the late afternoon around 4 p.m. to give a statement. After speaking with Ramirez, Detective Rohwer obtained a search warrant for her apartment, and officers photographed the sofa containing the sleeper bed with its cushions both on and off, exposing the metal bed frame underneath.

Jessica Gonzalez, the director of A.L.'s daycare, Noah's Ark, testified that A.L. would

6

attend the daycare on an inconsistent, drop-in basis maybe once a week. A.L. attended only for short periods of time, and thereafter, the daycare would not see him for a while. A.L. was a normal baby, not fussy, and Ramirez would personally bring him into the daycare. The employees at the daycare performed health checks on every child before engaging in any activities and made sure to document any mishaps that would occur. The daycare's records for A.L. showed that there were no such reported issues. A.L. stopped attending the daycare in April 2014.

*The Medical Specialists*

Eventually, A.L. was transferred from the trauma service at Las Palmas to the general pediatrics ward of the El Paso Children's Hospital due to his multiple leg and rib fractures, and once at the Children's Hospital, he was treated by Dr. Bert Johansson who was a pediatric intensivist there and the medical director of MEDCARES, a child protection and child abuse committee and clinic. Dr. Johansson received specialized training in pediatric critical care, and at the time of trial, he had 27 years of experience in dealing with child protection and child abuse. Dr. Johansson saw that A.L. was fearful and withdrawn, and throughout the three days during which Dr. Johansson cared for A.L., Ramirez did not interact much with the medical team, appeared removed from A.L., and sat away from A.L. on a sofa, even while others hovered around A.L.'s bed. Although Ramirez did not make any statement about how A.L.'s injuries occurred, she was cooperative with the medical staff who spoke to her.

In the medical records from the Children's Hospital that were admitted at trial, a section titled, "History of Present Illness" included, in part, the following compilation of what Ramirez reported to medical professionals:

> 14-month old male transferred from ER for multiple fractures. Three weeks ago mother took patient to PCP (primary care provider) for upper respiratory infection

and leg swelling. Doctor wrote script for imaging but mother lost them. Leg swelling got worse since then. Five days ago mom noticed patient limping and complaining of left leg pain. Patient taken to Las Palmas ER.

This section of the medical records also noted that there was no reported history of trauma.

Before treating A.L., Dr. Johansson reviewed the transfer notes detailing A.L.'s treatment at Las Palmas, and the medical records from Las Palmas were admitted at trial. These notes indicated that A.L had a femur fracture, a fibula fracture, and multiple rib fractures at various stages of healing. In addition, A.L. had an increase in the production of certain liver enzymes that indicated trauma to A.L.'s belly. Yet, A.L.'s examination showed that he had good bones and had no pre-existing medical conditions that could have caused his fractures aside from inflicted trauma.

Based on his specialized training, Dr. Johansson testified that the femur bone is a difficult body part for a 15-month-old child to fracture on his own when walking. He explained that the femur is the large bone in the thigh between the hips and the knee and that the fibula is a bone in the lower part of the leg between the knee and the ankle that, along with the tibia, helps stabilize the lower part of the leg. While acknowledging that a group of fractures known as "toddler's fractures" could occur due to the awkward gait of young children when they walk, these fractures would occur further down in the tibia and fibula, if at all, and not in the femur. Based on his review of nationalized data amongst the child abuse network, Dr. Johansson testified that it was highly unlikely that the femur fracture and the fibula fracture could have been caused by the toddler's-fracture phenomenon.

Dr. Johansson testified that rib fractures would likewise be uncommon in a child who was just beginning to walk, as opposed to an older child who might have been playing sports or wrestling with siblings. For a child who was not engaging in such athletic activity, rib fractures

would merit high suspicion for non-accidental trauma. Dr. Johansson testified that a child's ribs would be quite difficult to fracture because they would not have as much calcium as an adult's ribs and therefore would not be as stiff. Based on a study, Dr. Johansson believed that it would take about 30 to 50 pounds of force to break a child's rib. The location and nature of A.L.'s rib fractures implied that they were caused by someone holding and squeezing him.

Based on all the factors associated with A.L., Dr. Johansson was highly suspicious of non-accidental trauma, which he further explained, was "a way of saying that somebody may have injured this child." Dr. Johansson acknowledged that he did not know the mechanism of the injury, even though the fractures suggested how they occurred. Dr. Johansson testified that he would be highly concerned in a situation like A.L.'s because his sole caregiver may have been the abuser, may have simply not remembered the 15 to 20 minutes that the child was outside their care, or may have been living in fear of the actual abuser. But he further stated that the type of leg fractures sustained by A.L. would have been obvious because they would have been painful for the child and the child would have stopped walking. Dr. Johansson testified that it would be unreasonable for a parent not to seek medical attention immediately or, at least, within one day. And while rib fractures would have been harder to detect since there might not have been any bruise or swelling once the fracture started to heal, Dr. Johansson testified that a rib fracture would produce an audible sound. Such an injury would be very difficult to miss because it would be quite painful to the person experiencing it, and every breath taken could be painful for them. Considering all of A.L.'s injuries, Dr. Johansson ultimately testified, "[i]t is my professional opinion these are not accidental in nature."

Dr. Chetan Moorthy, a specialist in pediatric radiology, examined the head-to-toe x-rays

9

of A.L. and CAT scans of A.L.'s brain, chest, and abdomen. Dr. Moorthy had a special certification in his field, served as medical director and Chief of Staff at the Children's Hospital, and taught radiology residency students. Dr. Moorthy explained to the jury that radiology focuses on imaging diagnosis by using x-rays, CAT scans, and other such tools to take images of particular parts of a patient's body in which another doctor is interested and serving as a consultant by reviewing the images and providing an interpretation of what they showed. Through this process, a radiologist can determine the age of a fracture, the mechanism of an injury, and whether an injury was accidental or non-accidental.

Dr. Moorthy testified about how the age of a fracture could be determined. When a bone fractures, the outer lining of the bone, called the periosteum, tries to make new bone to fill in the crack that occurred in the fracture. On an x-ray, you can see various stages of healing. A fresh fracture will not show any signs of healing, a slightly older fracture will show early signs of healing, a much older fracture will show later signs of healing, and a healed fracture will no longer show any fracture and instead show that the bone tried to heal at some point in time. Because a fracture would take at least a specific amount of time to heal, Dr. Moorthy testified that he could say a completely healed fracture would have been that length of time from its occurrence. A review of A.L.'s x-rays showed that the fractured bone in A.L.'s leg attempted to heal but was unable to do so because medical attention was not sought quickly enough to immobilize the fracture. Dr. Moorthy testified that the fractures in A.L.'s leg were at least a few days to a couple of weeks old from the time of their x-ray imaging. Looking at the x-rays of A.L.'s ribs, Dr. Moorthy testified that he was able to see extra bone on the outside of his ribs called callus. This callus was new bone that had been generated to heal the ribs due to previous injury, and it indicated

10

that A.L. had old fractures in his ribs that had been healed along with new fractures, some of which were created on top of the old fractures. Dr. Moorthy testified that it would take a rib fracture at least six to ten weeks to heal, and Dr. Moorthy was able to say that A.L. had multiple fractures of different ages on both sides of his ribs. Since A.L.'s ribs showed evidence of old injuries that healed and new fractures on top of old fractures, Dr. Moorthy testified that the multiple rib injuries occurred over a long period of time. According to Dr. Moorthy, A.L. had so many rib fractures that there were "almost too many to count."

Dr. Moorthy testified that he saw fractures every day in his work at the Children's Hospital. Most were accidental, and he would see the most common fractures that kids would have hundreds of times in his work. Yet, the few fractures that did not fit the right pattern were the ones that caught his eye and that he could identify as being very difficult to occur accidentally. Dr. Moorthy acknowledged that there were some injuries in toddlers that could occur accidentally when a toddler planted their foot and twisted it. Such a movement would cause a spiral fracture of the bone that would be very easy to see and understand. A.L.'s x-rays showed that he had fractures in his fibula and tibia in his left leg above his ankle. Unlike an ankle twist, A.L.'s fracture was located above his ankle and went through both bones at the same level. Furthermore, the fracture was going horizontally across his ankle, as opposed to up or down, as shown in the direction of the fracture line. These traits indicated that it was a "grab and snap fracture" where one part of A.L.'s leg was immobilized and the other twisted to snap the bone across in the direction of the fracture. This mechanism of injury indicated that the fractures in A.L.'s fibula and tibia were not accidental.

Regarding A.L.'s rib fractures, Dr. Moorthy testified that the mechanism of injury was "almost certainly" an assailant grabbing A.L. by his chest and violently squeezing until his ribs

11

snapped. The fractures would have caused A.L. to experience "horrific pain." Dr. Moorthy believed that this was the mechanism of injury because all of A.L.'s rib fractures on both sides of his ribs were on similar sites and levels that appeared to match up with each other. Normal jostling and playing could not cause those injuries, and such injuries would have been noticeable to a caretaker. In all of Dr. Moorthy's experience, he never saw rib fractures like those sustained by A.L. to have been caused by an accident.

Using the standard of a prudent caregiver—meaning what care an ordinary mother, father, or teacher would provide—Dr. Moorthy testified that physicians would consider whether a child's caregiver sought medical care in an appropriate way based on what type of fracture a child sustained, how much pain the child might be in, and how obvious it would be to know that the child was in pain. Based on this standard, Dr. Moorthy testified that he would have expected an ordinary caregiver to express alarm at a situation where a child was walking about, suddenly stopped walking, and reverted to crawling, especially because walking would be an important milestone for most kids. A fracture would absolutely cause pain to a child, the skin and muscles around a fracture would swell up, and the skin would change color. Due to the immediate and severe pain incurred, a child would cry or act like he was in distress. Waiting for two weeks to seek medical attention would have been a delay of treatment.

When asked about whether falling off a couch in Ramirez's home could have caused A.L.'s fractures, Dr. Moorthy testified that it could not have done so. He acknowledged, however, that if a child got his foot stuck in the open area under the seat cushions between the metal bed frame and the inner wall of the couch and a parent pulled the child's leg straight across, but not upwards, such an action could have caused A.L.'s fractures above his ankle. But if A.L. had gotten on the

12

couch by himself, gotten his leg stuck in the opening, and gotten his leg out by himself, Dr. Moorthy testified that A.L. could not have caused the fractures above his ankle.

Dr. Moorthy testified that fractures could be divided into terms of suspicion as to whether they were accidental or non-accidental. Non-accidental injuries would be those caused by inflicted trauma such as an assault. A high-specificity finding would mean that a doctor was "very sure" that a fracture was non-accidental, an intermediate-specificity finding would mean the doctor's sureness was somewhere in between, and a low-specificity finding would mean that a doctor would not be sure. Both A.L.'s leg fractures and rib fractures were high-specificity findings for non-accidental trauma. And like Dr. Johansson, Dr. Moorthy testified that A.L.'s bones were "normal," meaning they showed no signs of any underlying nutritional or metabolic disease.

When asked for his opinion as a pediatric radiologist regarding whether A.L.'s injuries were accidental or non-accidental, Dr. Moorthy testified, "We are very confident that these are not accidental."

*The Video-recorded Statement from Ramirez*

After being read her Miranda rights and voluntarily waiving them, Ramirez gave a video-recorded statement to Detective Rohwer and Detective Snow. It was admitted into evidence at trial and played for the jury. In her statement, Ramirez said that she had been living at her apartment in El Paso for six months and had previously lived in Anthony, New Mexico. Her boyfriend's name was on the rental contract, and he would sometimes stay there. But he did not live there. At the time of the interview, she was living with her two daughters, a five year old and two year old, and with A.L. Her older daughter would sometimes carry A.L. if he was crying, but Ramirez would be nearby. Ramirez's younger daughter was not yet able to carry A.L. Ramirez

13

described her boyfriend as being good with her kids and they called him "Dad." She claimed, however, that he was never alone with them and he would never hold A.L. A.L.'s father, Alberto, lived in Pecos, and the last time he saw A.L. was about six months prior. Ramirez's sister used to take care of her children when Ramirez was working, but Ramirez said she was not working at the time of the interview and had not worked for at least the past six months. Ramirez stated that she had sole care of her son and no one else cared for him.

Ramirez mentioned that A.L.'s primary physician was Dr. Muñoz but that A.L. would not see the doctor regularly because she would only take him to be seen when he got sick and, simply, "he wouldn't get sick." Ramirez stated that the last time A.L. saw Dr. Muñoz was about two to three weeks ago because he needed shots and had a cold. At the time of that appointment, A.L. had suddenly stopped walking, and A.L. cried and got fussy when he would try to get up. Also, A.L.'s left leg appeared "a little fat" and bigger than normal. When Ramirez pointed this out during the appointment, Dr. Muñoz gave Ramirez a referral to take A.L. to the hospital for x-rays. Ramirez said she did not ever get the x-rays because she lost the referral sheet. She added that A.L. suddenly got better but still could not walk, and she massaged the swollen area on his leg. During her video-recorded statement, Ramirez pointed out to the detectives where the bump on A.L.'s leg had been.

Ramirez later stated that she noticed A.L.'s leg getting fat two days before going to the hospital but acknowledged that A.L.'s leg had been swollen at the time of the appointment with Dr. Muñoz, just not as bad, and she explained that he otherwise appeared normal at the appointment. When Detective Rohwer asked how Ramirez thought A.L.'s injuries occurred, Ramirez said she did not know. Ramirez suggested that A.L. possibly got his leg tangled up in the

14

metal frame of the fold-out bed in her couch. But she never saw her son get tangled up in the couch. She also guessed that A.L. may have gotten his leg injury from merely walking. As for the rib fractures, she had no explanation for how those might have occurred. When asked about the bruises on A.L.'s body, Ramirez said she had not seen those prior to A.L.'s treatment at the hospital, and she thought A.L. might have caused the bruise on his chin by hitting himself with his bottle. Ramirez stated that there was no health history in her family that would explain A.L.'s injuries.

In her statement, Ramirez denied ever hitting her son and said that she would not have taken him to the hospital if she had done so. She did not know how he got his injuries, and she never saw anyone else harm him. When Detective Rohwer suggested that A.L. would have had difficulty breathing because of his rib injuries, Ramirez stated that A.L. always breathed really fast. She added that he would cry for much of his days as soon as he would wake up, and he had always been a fussy child. Ramirez also stated that she never had a CPS case against her before.

*The Defense's Case*

After the State rested its case-in-chief, Ramirez moved for a directed verdict on all four of the counts charged against her. The trial court granted a directed verdict on Count I and Count IV but denied a directed verdict on Count II and Count III. During Ramirez's case-in-chief, she presented her sister, Melissa Ramirez (Melissa), as her sole witness. Melissa testified that Ramirez was her baby sister and was living in New Mexico when A.L. was born. At that time, Ramirez lived with A.L.'s father, Alberto, her two daughters, and possibly some roommates. While living in New Mexico, Ramirez was working every day, and Alberto would be at home with A.L. and the girls. Alberto had the primary responsibility for taking care of the children, but sometimes

15

Alberto's siblings or parents would help. And while Ramirez would pick up A.L. only from his armpits when she carried him, Alberto would pick him up by his ribs.

When Ramirez and Alberto ended their relationship, Ramirez moved into her apartment complex on 5130 Chromite in El Paso where her mother and other family members also lived. Ramirez's new boyfriend leased her apartment at 5130 Chromite for her and also had access to A.L., but he did not live with her and worked out of town.

Melissa testified that a lot of people watched A.L. She knew he had babysitters at Noah's Ark daycare. Further, Melissa saw Ramirez's older daughter carry A.L. and also drop him. Melissa testified that she, too, would sometimes take care of A.L. When she did, she did not notice any indications of physical abuse. If she had, she testified that she would have reported concerns to CPS.

On cross-examination, Melissa admitted she was unaware that Ramirez told police that she had not been working six to eight months prior to giving her statement in October 2014. Melissa was likewise unaware that Ramirez told police that Alberto has not seen A.L. for the past six months leading up to her statement. Melissa did not know that A.L. had not attended daycare since April 2014. Melissa did acknowledge, however, that A.L. and Ramirez moved from their home in New Mexico to El Paso six months prior to October 2014.

*The Verdict*

The jury found Ramirez guilty on Counts II and III as charged in the indictment after the trial court had granted a directed verdict on two other charged counts. After a punishment hearing, the trial court assessed punishment at three years' confinement and a $1,000 fine, suspended her sentence, and placed her on ten years' community supervision. This appeal followed.

16

## DISCUSSION

In two issues, Ramirez challenges the legal sufficiency of the evidence to sustain her injury-to-a-child conviction under the alternative manners and means charged in Counts II and III. She argues that the evidence was insufficient because the State failed to prove that she injured A.L. and, if she did, that she had the requisite mental state to be convicted of the crime.[2] The State replies that the circumstantial evidence presented at trial was legally sufficient to support her conviction where: (1) the medical testimony established the timing of A.L.'s injuries, their non-accidental nature, and that he experienced bodily injury; (2) the evidence established that Ramirez was A.L.'s sole caretaker during the time frame in which his injuries occurred; and (3) the evidence allowed an inference that Ramirez intentionally or knowingly caused bodily injury to A.L. due to the extent and method of A.L.'s injuries, Ramirez's failure to seek medical treatment, and her implausible explanations for his injuries.

*Standard of Review*

Due process requires the State to prove every element of the crime charged beyond a

---

[2] Ramirez relies almost exclusively on the Texas Court of Criminal Appeals' opinion in *Walker v. State* and the Austin Court of Appeals' opinion in *Nisbett v. State* for her argument. *See Walker v. State*, Nos. PD-1429-14 and PD-1430-14, 2016 WL 6092523 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication); *Nisbett v. State*, No. 03-14-00402-CR, 2016 WL 7335843 (Tex. App. – Austin Dec. 15, 2016), *rev'd*, 552 S.W.3d 244 (Tex. Crim. App. 2018). However, we note that an unpublished opinion from the Court of Criminal Appeals has no precedential value and must not be cited as authority by counsel or by a court. TEX. R. APP. P. 77.3; *see also Ex parte Ramos*, --- S.W.3d ---, 2019 WL 1054122, at *5 (Tex. App. – El Paso Mar. 6, 2019, no pet. h.) (declining to rely upon an unpublished case from the Court of Criminal Appeals cited in appellant's argument as a basis for this Court's decision). As such, we cannot rely upon *Walker* here. And neither does Ramirez's reliance on the Austin Court of Appeals' decision in *Nisbett* do her any good either. The Austin Court of Appeals reversed Nisbett's conviction solely on the ground of legal sufficiency, but on review by the Court of Criminal Appeals, the intermediate court's judgment was reversed after the Court of Criminal Appeals found that the evidence was, in fact, legally sufficient to support her conviction. *See Nisbett*, 2016 WL 7335843, at *17, *rev'd*, 552 S.W.3d at 268.

reasonable doubt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In reviewing the legal sufficiency of the evidence, a reviewing court must ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. *Nisbett*, 552 S.W.3d at 262. This standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*. An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. *Id*. A court's role on appeal is restricted to guarding against the rare occurrence when the fact finder does not act rationally. *Id*.

It is not necessary that the evidence directly prove the defendant's guilt. *Id*. Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt. *Id*. In fact, circumstantial evidence alone can be sufficient to establish guilt. *Id*. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id*. And because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Id*.

*The Hypothetically Correct Jury Charge*

A reviewing court measures whether the evidence presented at trial was sufficient to support a conviction by comparing it to the elements of the offense as defined by the hypothetically correct jury charge for the case. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The hypothetically correct

jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Zuniga*, 551 S.W.3d at 733.

In this appeal, the indictment charged Ramirez as follows:

COUNT II

. . .

ASHLEY RAMIREZ, hereinafter referred to as Defendant,

did then and there intentionally or knowingly cause bodily injury to [A.L.], a child 14 years of age or younger, by squeezing the body of [A.L.] with Defendant's hands . . .

COUNT III

. . .

ASHLEY RAMIREZ, hereinafter referred to as Defendant,

did then and there intentionally or knowingly cause bodily injury to [A.L.], a child 14 years of age or younger, by twisting or striking [A.L.]'s legs with Defendant's hands . . . .

A person commits the third-degree felony offense of injury to a child if she intentionally or knowingly causes bodily injury to a child fourteen years or younger. TEX. PENAL CODE ANN. § 22.04(a)(3), (c)(1). The Texas Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A person acts intentionally, or with intent, with respect to the nature of her

19

conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a). A person acts knowingly, or with knowledge, with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b).

As relevant to the issues argued by Ramirez in this appeal, the hypothetically correct jury charge required the State to prove only that Ramirez intentionally or knowingly caused A.L. bodily injury and did not require the State to prove that she did so, specifically, through either of the alternative manner and means alleged in its charged Count II or Count III. *See Williams*, 235 S.W.3d at 750; *see also Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (noting, under the injury-to-a-child statute, that the nature of conduct committed is inconsequential so long as the conduct is voluntary and done with the required culpability); *Phelps v. State*, 999 S.W.2d 512, 518 (Tex. App. – Eastland 1999, pet. ref'd) (holding that the hypothetically correct jury charge for injury to a child would not include the descriptive phrase "with his hand" because the phrase unnecessarily increased the State's burden of proof). Therefore, we will review both of Ramirez's issues together in determining whether the evidence was legally sufficient.

*Application*

Proving a charge of injury-to-a-child often depends on circumstantial evidence because "there is rarely direct evidence of exactly how the child's injuries occurred[.]" *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App. – Houston [1st Dist.] 2009, pet. ref'd); *Tena v. State*, No. 08-15-00152-CR, 2017 WL 3224961, at *7 (Tex. App. – El Paso July 31, 2017, no pet.) (not designated for publication). As we earlier recognized, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is

20

sufficient to support a conviction" for injury to a child.  *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App. – El Paso 2000, pet. ref'd); *Tena*, 2017 WL 3224961, at *7.

A culpable mental state, by its nature, must generally be inferred from the circumstances. *Nisbett*, 552 S.W.3d at 267.  We cannot read an accused's mind, and absent a confession, we must infer her mental state from her acts, words, and conduct.  *Id*.  Inconsistent statements or implausible explanations to law enforcement can provide evidentiary support for a conviction.  *See Nisbett*, 552 S.W.3d at 266; *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  The defendant's culpable mental state may also be inferred from the extent of the victim's injuries.  *Nisbett*, 552 S.W.3d at 267.  We may also consider the method used to produce the injuries.  *See Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App. – Texarkana 2017, pet. ref'd).   In addition, intent or knowledge may be inferred based on the occurrence of a previous similar injury.  *See Morgan v. State*, 692 S.W.2d 877, 881-82 (Tex. Crim. App. 1985); *Crider v. State*, No. 11-16-00302-CR, 2018 WL 1547217, at *5 (Tex. App. – Eastland Mar. 30, 2018, no pet.) (mem. op., not designated for publication).

*The Medical Testimony Establishing A.L.'s Injuries*

Regarding the timing of A.L.'s injuries, the records from Las Palmas reflected that A.L.'s femur fracture, fibula fracture, and multiple rib fractures were at various stages of healing at the time he was seen for medical treatment.  Based on Dr. Moorthy's review of A.L.'s x-rays and his understanding of how bones heal, he testified that A.L.'s leg fractures were at least a few days to a couple of weeks old.  This time frame for A.L.'s leg injuries comported with Ramirez's own statements to others about her sole involvement in taking care of A.L.  Baker testified to Ramirez reporting that A.L. had stopped walking on his left leg days before she took him to Las Palmas for

21

treatment. Carreon testified that Ramirez reported seeing A.L. immobile for the 48 hours prior to his hospitalization. The compilation of notes in the medical records from the Children's Hospital also reflected that Ramirez reported noticing that A.L.'s leg was swollen three weeks prior to his hospitalization and that A.L. was limping and complaining of left leg pain five days prior. In Ramirez's video-recorded statement, she told detectives that at the time of A.L.'s last appointment with Dr. Muñoz, a little over one week prior to A.L.'s hospitalization, A.L. had suddenly stopped walking, and A.L. cried and got fussy when he would try to get up. Ramirez also stated that A.L.'s left leg appeared "a little fat" and bigger than it should have been. She said that A.L.'s leg got even worse about two days prior to taking him to Las Palmas. Aside from his leg fractures, A.L. had multiple fractures of different ages on both sides of his ribs, and since rib fractures would take at least six to ten weeks to heal, his healed rib fractures were older than six weeks and his unhealed fractures were less than six weeks old.

Turning to whether A.L.'s injuries were non-accidental, the evidence showed that A.L. had presented with "good, dense bones[.]" In other words, evidence showed that because of "the density and bone formation, that they cannot be easily fractured." Dr. Johansson acknowledged that "toddler's fractures" had been reported to occur but testified that it was highly unlikely that the femur and fibula fracture could have been caused by that phenomenon based on his review of nationalized data amongst the child abuse network. Similarly, Dr. Johansson testified that rib fractures would cause him to highly suspect non-accidental trauma where a child was just beginning to walk, as opposed to an older child who might be engaged in more rough, physical activities. Dr. Johansson added that the femur would be a difficult part of the body for a 15-month-old child to fracture on his own. Then, when you add in the fibula, it becomes "highly unlikely"

22

for the fractures to be caused by a child's own walking. Based on all the factors associated with A.L.'s injuries, Dr. Johansson pointedly testified, "[i]t is my professional opinion these are not accidental in nature." Dr. Moorthy testified similarly that, while some toddlers were known to sustain a leg injury by planting their foot and twisting it, A.L.'s ankle fracture instead indicated that it was a non-accidental "grab and snap fracture" based on its unique characteristics. Dr. Moorthy testified that A.L.'s rib and leg fractures were all high-specificity findings for non-accidental trauma, meaning he was "very sure these injuries were not accidental."

And regarding whether A.L. would have felt pain from his injuries, Dr. Moorthy testified that a bone fracture would cause immediate and severe pain. More specifically, Dr. Moorthy described that a rib fracture would cause "horrific pain," and even simple breathing would be painful. In accord with the medical testimony, CPS investigator Carreon testified that when she observed A.L. it appeared that his movements appeared to cause him pain.

Thus, the evidence established that A.L.'s leg fractures were between a few weeks to a couple of days old, that A.L. had rib fractures both newer and older than six weeks of age, that A.L.'s fractures were non-accidental, and that his fractures were painful to him. In her brief to this Court, Ramirez argues that the lack of any certainty from the State's medical experts regarding how A.L.'s injuries occurred militates in her favor on the sufficiency analysis. Although Dr. Moorthy acknowledged that it was possible for A.L.'s leg fractures to have been caused by A.L. getting his foot stuck in Ramirez's couch, Dr. Moorthy conditioned this statement on an assumption that someone would have also had to have pulled A.L.'s leg straight across, rather than upwards, and Dr. Moorthy testified that A.L. in no way could have caused such a fracture if he got his leg out by himself. Furthermore, both Dr. Moorthy and Dr. Johansson testified to their

23

confidence that A.L.'s injuries were caused by non-accidental trauma. The jury was free to choose between accepting Ramirez's asserted theory of how A.L. might have sustained his injuries or accepting the State's asserted theory, supported by the testimony of medical experts, that A.L.'s injuries were not likely caused by accidental trauma. *See Nisbett*, 552 S.W.3d at 262 (the fact finder's responsibility is "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). By their verdict, the jury chose to afford dispositive weight to opinions from the State's experts who expressed opinions within a reasonable degree of medical certainty that A.L.'s injuries were non-accidental based on their education, training, and experience. In our sufficiency analysis, we must accept the jury's resolution of the factual disputes, and we are prohibited from sitting as a thirteenth juror and making our own independent assessment of the evidence. *See Nisbett*, 552 S.W.3d at 262.

*Evidence Establishing Ramirez as Sole Caretaker During the Critical Time Frame*

Once it is established that the child victim's injuries were the result of non-accidental trauma, "[t]he question then becomes one of timing–who had control of the child at the time of injury." *Tena*, 2017 WL 3224961, at \*7. Ramirez told Baker that no one else cared for A.L. during the critical time frame, nor did he attend daycare. Ramirez also told Carreon that she had been A.L.'s primary caregiver since the time that she lost her employment around June or July that year. Ramirez told Carreon that she stayed at home with A.L. and that she cared for him all throughout the day. Ramirez confirmed to Carreon that, at that point in time at which A.L. was hospitalized, she was the only person taking care of A.L. In addition, the director of A.L.'s old daycare testified that Ramirez would personally bring A.L. to daycare but that A.L. stopped attending in April 2014. In her video-recorded statement, Ramirez explained that she had been living alone with her

daughters and A.L. at her apartment on 5130 Chromite in El Paso for the past six months after having moved from Anthony, New Mexico. Although her older daughter would sometimes carry A.L., Ramirez would stay nearby, and neither her new boyfriend nor Alberto had the opportunity to cause injury to A.L. On video, Ramirez flatly stated that she had sole care of her son and that no one else cared for him.

Ramirez's sister, Melissa, offered the jury other individuals who might have been the actual perpetrator of A.L.'s injuries. However, Melissa's testimony was contradicted by Ramirez's own statements to other witnesses that many of these alternative perpetrators did not have access to A.L. for the past six months during which she was living in El Paso and that, quite simply, she was the sole person who took care of A.L. during that time. Even were this not the case, the jury was free to discredit Melissa's testimony of an alternate perpetrator. *Nisbett*, 552 S.W.3d at 262; *see also Wilkens v. State*, No. 04-12-00781-CR, 2014 WL 1871327, at *4 (Tex. App. – San Antonio May 7, 2014, no pet.) (mem. op., not designated for publication) (holding that the jury was free to reject the scenarios urged by the defendant that the victim's mother could have been the perpetrator of the child victim's injuries or that the injuries occurred while the victim was at daycare).

Considering that the evidence established that A.L. suffered non-accidental, painful trauma well within the same time frame during which Ramirez had sole custody and care of A.L., the evidence was legally sufficient to support the jury's conclusion that Ramirez was the person who caused A.L.'s injuries. *See Tena*, 2017 WL 3224961, at *7 (reasoning that the jury could conclude that the defendant was the perpetrator where the evidence established that he had sole contact with the victim from the time of the injury up through the time the victim began exhibiting profound symptoms); *Parrilla v. State*, No. 05-12-01372-CR, 2014 WL 261066, at *5 (Tex. App. – Dallas

25

Jan. 23, 2014, no pet.) (not designated for publication) (holding that it could be inferred that the defendant was the person who injured the child victim based on the defendant having been at home with the child most of the time since he was unemployed and having been the primary caregiver for the child); *Martin v. State*, 246 S.W.3d 246, 262 (Tex. App. – Houston [14th Dist.] 2007, no pet.) (holding that the evidence was legally sufficient to establish that the defendant caused the child victim's injuries where the medical testimony narrowed down the potential time frame of death, while not precisely identifying the exact time of death, and the defendant's testimony corroborated her access to the victim). Since the evidence was legally sufficient for the jury to infer that Ramirez caused A.L.'s injuries, we now turn to the second thrust of Ramirez's argument challenging whether the evidence was legally sufficient to prove that she intentionally or knowingly did so.

### *Circumstantial Evidence of the Required Mental State*

Turning to the evidence bearing on whether Ramirez engaged in intentional or knowing conduct, we begin our discussion of the required mental state with the premise that a culpable mental state, by its nature, must generally be inferred from the circumstances because we cannot easily read an accused's mind absent a confession. *See Nisbett*, 552 S.W.3d at 267. With that tenet informing our analysis, we first look at Ramirez's acts, words, and conduct. While at Las Palmas, Carreon testified that she never personally saw Ramirez interacting directly with A.L, that Ramirez did not express any concern or urgency for A.L.'s condition, and that Ramirez spoke in a flat, monotone fashion when discussing A.L.'s injuries. Detective Rohwer also observed Ramirez not showing much emotion at the hospital. Similarly, Dr. Johansson testified that Ramirez did not interact much with the medical team and appeared to be removed from A.L. While none of these

26

facts in isolation would alone prove a culpable mental state, they are circumstances that help paint the portrait of Ramirez's mindset about A.L.'s well-being. *See Nisbett*, 552 S.W.3d at 266 (noting as incriminating circumstances that the defendant was the last person to have contact with the victim before the commission of the charged offense and that the defendant exhibited unusual behavior immediately afterwards).

Furthermore, Ramirez's conduct towards her son did not match the obvious injuries he had. Baker testified that her observations of A.L. caused her to believe that he was being abused because he was slight and small for his age, he had a multitude of bruises on various parts of his body, and his bruises would have been greater than a day or two old. Carreon testified that A.L. was in a highly disturbing condition, that any movement appeared to cause him pain, and that he had several bruises around his body. Nevertheless, Ramirez never took A.L. to get the x-rays pursuant to Dr. Muñoz' referral before A.L.'s hospitalization. And despite Dr. Muñoz having been the long-time family doctor for Ramirez's family, the medical records from Dr. Muñoz' office reflected that Ramirez had not brought A.L. to his office for a standard well-child-care appointment since A.L. was two-months' old and that A.L. had missed four of those appointments. Ramirez's failure to follow through with Dr. Munoz's order for x-rays, combined with her failure to take A.L. to get general check-ups from his doctor, are also circumstances showing a culpable mental state. *Cf. Nisbett*, 552 S.W.3d at 264 (noting that a victim's failure to make scheduled appointments can be an incriminating circumstance against a defendant).

In Ramirez's video-recorded statement, she explained that she did not take A.L. to get x-rays as ordered because she lost the referral sheet. Ramirez also said that she would not regularly take A.L. to see Dr. Muñoz because she would only take him when he got sick, and "he wouldn't

27

get sick." The medical records from the Children's Hospital also noted that Ramirez had reported no history of trauma for A.L. However, Ramirez's statements and lack of reported trauma for A.L. are made all the more egregious by the obvious bruising all around A.L.'s body and the medical testimony describing a multitude of rib fractures that were almost too numerous to count. Ramirez's lack of reported medical history for A.L. flew in the face of the evidence describing the many old injuries A.L. had and therefore provided another circumstance showing her culpable mental state. *See Nisbett*, 552 S.W.3d at 265-66 (holding that prior behavior by a defendant towards a victim can be relevant to a determination of whether the defendant committed the charged conduct).

As a last matter with regard to her conduct, the evidence showed that Ramirez failed to obtain medical care for A.L.'s multiple fractures at a time when it should have been obvious for a parent to know that they should have done so. Baker testified that there should have been enough of a concern for Ramirez to seek medical care where her child had stopped walking when they would normally have been walking around. Dr. Johansson also expressed that a rib fracture would be noticeable because it would produce an audible sound and be painful to the person experiencing it. Under the standard of a prudent caregiver, Dr. Moorthy would have expected a caregiver to express alarm at conditions comparable to those exhibited by A.L., and he testified that waiting to seek medical attention for a period of two weeks would have been a delay of treatment. With the type of leg fractures A.L. had, Dr. Johansson testified that it would have been unreasonable for a parent not to seek medical attention within one day. Even Dr. Muñoz testified that it would be unreasonable to not take a child to get previously ordered x-rays if the child had stopped walking. Based on this testimony from all the medical professionals involved with A.L., Ramirez's failure

28

to get timely medical treatment for A.L. was a circumstance from which a jury could infer that she had a culpable mental state. *See Wensel v. State*, No. 08-10-00051-CR, 2011 WL 4529774, at \*5 (Tex. App. – El Paso Sep. 30, 2011, no pet.) (not designated for publication) (holding that failure to render aid known to be needed supported an inference that a victim's injuries were intentionally, not accidentally, inflicted); *cf. Guerrero v. State*, No. 04-15-00762-CR, 2016 WL 4537694, at \*8 (Tex. App. – San Antonio Aug. 31, 2016, no pet.) (mem. op., not designated for publication) (observing in an injury-by-omission case that the failure to obtain quick medical care for a poor physical condition that is apparent or obvious can show a person's mental state regarding the injury).

We look next at the extent of A.L.'s injuries and the method used to produce his injuries. The extent of A.L.'s injuries included a femur fracture, a fibula fracture, a tibia fracture, and a multitude of rib fractures that were almost too many to count. All were at various stages of healing. In all his experience, Dr. Moorthy had never seen rib fractures like those sustained by A.L. Dr. Johansson and Dr. Moorthy both testified that the nature of A.L.'s injuries allowed them to say with confidence that they did not occur from non-accidental trauma, and such injuries would have been difficult for A.L. to inflict on his own. Dr. Moorthy testified that the traits of A.L.'s leg fractures indicated that they were "grab and snap" fractures. The testimony from Dr. Moorthy and Dr. Johansson established that the cause of A.L.'s rib fractures appeared to be someone holding and squeezing him, and Dr. Johansson testified that it would take 30 to 50 pounds of force to cause the rib fractures. Based on this medical testimony, the extent and method of production of A.L.'s injuries also showed that the perpetrator who inflicted the injuries on A.L. did so intentionally or, at least, knowingly. *See Martinez v. State*, 468 S.W.3d 711, 716 (Tex. App. – Houston [14th Dist.]

29

2015, no pet.) (holding that the severity of the child victim's injuries alone supported an inference that they were caused intentionally and knowingly where: (1) an expert testified that the sort of act necessary to cause the injuries would be of a nature that any reasonable adult would see and immediately feel like they would have to intervene; and (2) experts testified that the injuries were caused by abusive, non-accidental trauma); *Parrilla*, 2014 WL 261066, at *5 (holding that it could be inferred that the defendant intended to cause bodily injury to the child victim based, in part, on the severity of the injuries since it would have been obvious that the child was in pain); *Herrera v. State*, 367 S.W.3d 762, 771-72 (Tex. App. – Houston [14th Dist.] 2012, no pet.) (holding that the child victim's injuries supported a finding that the defendant caused them intentionally or knowingly where a doctor testified that the victim's injuries were consistent with having been slammed, thrown, dropped from some height, or shaken strongly). Also, A.L.'s numerous rib fractures of different ages on both sides of his ribs would allow for an inference that Ramirez inflicted those injuries intentionally or knowingly. *See Morgan*, 692 S.W.2d at 881-82; *Crider*, 2018 WL 1547217, at *5.

Finally, we turn our attention to the inconsistent or implausible explanations that Ramirez gave regarding how A.L. got into the condition he was in at the time of his hospitalization. Ramirez told Baker that she noticed A.L. had stopped walking days prior to his hospitalization, but Ramirez denied knowing what happened to A.L. Ramirez told Carreon that even though A.L. had been immobile for the past 48 hours, she only massaged A.L.'s leg rather than tried to seek any medical attention. Ramirez likewise had no explanation for Carreon about how any of his injuries happened, and Carreon testified that she believed Ramirez's statements were inconsistent with A.L.'s injuries. In her video-recorded statement, Ramirez repeated that she did not know how

30

A.L.'s injuries occurred, even though she later offered the explanation of A.L. possibly having gotten his leg caught in her couch's fold-out bed or possibly from walking. Ramirez told Detective Rohwer that at the time of A.L.'s last visit with Dr. Muñoz she had already seen A.L. unable to walk and seen that he had a swollen leg. Although she later stated that she noticed A.L.'s leg getting fat two days before going to the hospital, she acknowledged to the detectives that A.L.'s leg was already swollen at the time of the appointment with Dr. Muñoz. Ramirez also denied knowing that A.L. had bruises on his body, and she offered as an explanation that A.L. might have caused the bruise on his chin by hitting himself with his bottle. When Detective Rohwer pointed out that A.L. would have had noticeable difficulty breathing because of his rib injuries, Ramirez stated that A.L. always breathed fast and added that A.L. had always been a fussy child who would cry for much of his days from the moment he woke up. The jury was entitled to find Ramirez's explanations, or lack thereof, to be untenable in light of the medical facts that reflected both recent and past abuse and indicative of her culpable mental state here. *See Nisbett*, 552 S.W.3d at 267 (noting as an incriminating circumstance that the defendant made suspicious and implausible statements to the police); *Mathison v. State*, No. 11-12-00052-CR, 2014 WL 887282, at *4 (Tex. App. – Eastland Feb. 27, 2014, no pet.) (mem. op., not designated for publication) (holding that a jury can consider whether an explanation is plausible when determining whether the defendant caused the child's injuries).

While it might have been the case that none of these circumstances on their own would have provided a sufficient inferential link to prove that Ramirez caused A.L.'s injuries intentionally or knowingly, we cannot say that the jury's resolution of this issue was irrational based on the entirety of the circumstances. We therefore hold that the cumulative force of all the

incriminating circumstances was sufficient to prove Ramirez's intent or knowledge here.

*The Evidence was Legally Sufficient to Support the Jury's Verdict*

Despite Ramirez's statements that she never had a CPS case against her before, that she never hit her son, and that she never saw anyone else harm him, the jury was entitled to resolve the competing theories advanced in the case against her. *Nisbett*, 552 S.W.3d at 262. Although the State's case was one based entirely on circumstantial evidence, this Court has time and again observed, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction" for injury to a child. *Garcia*, 16 S.W.3d at 405; *Tena*, 2017 WL 3224961, at *7.

Such was the case here where the evidence was legally sufficient based on the medical testimony establishing the timing and non-accidental nature of A.L.'s painful injuries, the evidence establishing that Ramirez was A.L.'s sole caretaker during the time frame in which his injuries occurred, and the cumulative weight of the all the contextual circumstances showing that Ramirez intentionally or knowingly caused those injuries. *See Tena*, 2017 WL 3224961, at *7-8 (holding that the evidence was legally sufficient to prove the defendant's injury-to-a-child charge where: (1) the injury resulted from some form of trauma; and (2) the victim was in the defendant's sole care during the time frame in which the injury must have occurred according to medical testimony); *Williams*, 294 S.W.3d at 683 (rejecting the defendant's argument that the evidence was insufficient to support her conviction for capital murder by intentionally or knowingly causing the death of a child since the evidence against her was "entirely circumstantial" and holding instead that the evidence was sufficient where: (1) the child's injuries were extensive, could not have occurred through any of the ways the defendant offered as an explanation, and must have been

32

sustained through physical abuse by an adult; (2) the defendant admitted being alone with the child at several periods during the time the medical examiner testified that the child sustained the injuries; and (3) the culprit who inflicted the injuries would have known that he or she was harming the child and must have intended to do so); *see also Mendoza v. State*, No. 05-16-00100-CR, 2017 WL 2334236, at *5-6 (Tex. App. – Dallas May 30, 2017, no pet.) (mem. op., not designated for publication) (considering in its legal sufficiency review: (1) the cause of the child victim's injuries; (2) who was with the victim during the time frame in which the injury occurred; and (3) the defendant's explanations that were inconsistent with the medical evidence of how the injuries occurred). Having considered Ramirez's first and second issues together, we overrule both and hold that the evidence was legally sufficient for her conviction of causing injury to her child, A.L.

## II.

We note here that the trial court certified Ramirez's right to appeal in this case, but the certification does not bear her signature indicating that she was informed of her rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 25.2(d). The certification is therefore defective and has not been corrected by Ramirez's attorney or the trial court. To remedy this defect, this Court ORDERS Ramirez's attorney, pursuant to TEX. R. APP. P. 48.4, to send Ramirez a copy of this opinion and this Court's judgment, to notify Ramirez of her right to file a pro se petition for discretionary review, and to inform Ramirez of the applicable deadlines. *See* TEX. R. APP. P. 48.4, 68. Ramirez's attorney is further ORDERED to comply with all requirements of TEX. R. APP. P. 48.4.

## CONCLUSION

The trial court's judgment is affirmed.


June 14, 2019                                    GINA M. PALAFOX, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)